**UNITED STATES of America,**
**Plaintiff**

**v.**

**CERTAIN INTERESTS IN PROPERTY IN MONTEREY COUNTY,** State of **CALIFORNIA; Likins-Foster Monterey Corporation,** a Delaware corporation, **Likins-Foster Ord Corporation,** a Delaware corporation, et al., and Unknown Owners, Defendants.

**No. 36839.**

United States District Court
N. D. California, S. D.
June 15, 1960.

**168**

———————

Lynn J. Gillard, U. S. Atty., Charles R. Renda, San Francisco, for plaintiff.

Joseph M. Williamson, Urbana, Ill., Raymond R. Dickey, Washington, D. C., for defendants.

YOUNGDAHL, District Judge.

This is an action brought by the United States to condemn defendants' leasehold interests, subject to outstanding mortgages, in a Wherry Act [1] housing project located near Monterey, California, on Fort Ord. Long-term leases on government land, with an annual nominal rental of $200 to be paid to the government by the defendants, were entered into on November 16, 1950 and June 27, 1952. The project was completed about 1952; some 615 residential buildings, comprising 1,000 dwelling units, were constructed, as well as all necessary streets, walks, and sewage systems. The leases provided that the defendant corporations were to operate the project, although some supervisory control was reserved to the plaintiff. The improvements became the property of the United States upon completion, with occupancy restricted to military or civilian personnel of the Armed Services, although provision was made for other residents in the event units were available. The property was condemned because additional military housing was found necessary at Fort Ord and under the provisions of the Capehart Act [2] acquisition of the Wherry project by negotiation or condemnation became mandatory. Negotiation having failed, a complaint in condemnation and a declaration of taking were filed by the United States on November 1, 1957.

At the trial, the sole issue for the jury to determine was the crucial one of "just compensation". The government asserted that the award should be between $650,000 and $683,000; the defendants contended they were entitled to between $3,680,000 and $3,880,000. The jury's verdict was $1,106,000.

■ Defendants have moved for a new trial. The principal point urged is that the government utilized a method of valuation that was improper in view of a stipulation between the parties. This stipulation, embodied in the pretrial order, reads:

> "There are no comparable sales that should be considered by the jury in this case, and there will be no proffer of any comparable sales in the trial of this cause."

■ One of the methods utilized to determine the value of condemned property is comparable sales: the value of other similar property, as displayed by its recent sales price, is considered indicative of the condemned property's value. 1 Orgel, "Valuation Under Eminent Domain" § 137 (1953 ed.).

A second method utilized to determine the value of condemned property is by the capitalization of income: the future net income to be expected from the property is discounted to the present to provide for both a return on the investment and an amortization of the investment. 1 Orgel, supra, § 176 et seq.; and see Burritt Mutual Savings Bank v. City of New Britain, 1958, 20 Conn.Sup. 476, 140 A.2d 324.

---

1. 12 U.S.C.A. § 1748 et seq. Actually, two projects were authorized and two corporations formed, but the Court will speak of them as one for purposes of this memorandum.

2. 42 U.S.C.A. § 1594a, as amended.

In order not to prolong the trial with much testimony on the true comparability of the "comparable" sale, as well as to avoid the problem of whether the comparable sales establish a market value for the condemned property,[3] the parties stipulated that the first method of valuation was not to be used. Defendants do not contend that the government violated the stipulation by showing sales prices of comparable property; defendants contend that the government's witnesses violated the stipulation indirectly by ascertaining their capitalization rates, in part, by referring to the rates of return on real estate transactions, including real estate that was similar to the Wherry project.

The Court is of the opinion that there is a distinction between:

(1) The use of comparable sales as direct proof of the value of the condemned property, and

(2) The use of the sales price of comparable property by an expert—along with noncomparable property such as stocks, bonds and dissimilar real estate— to arrive at prevailing market conditions, and thus be able, after consideration of the risk involved in the various sales, to set a realistic and just capitalization rate for the property condemned.[4]

3. See discussion in United States v. Benning Housing Corporation, 5 Cir., 1960, 276 F.2d 248, 251.

4. At the close of the direct examination of Robert C. Hastings, an expert witness for the government, the following occurred:

"Q. [Mr. Renda] Could you explain, sir, what considerations you gave and why you arrived at the conclusion that the prudent seller would sell for, would sell his interest in this project for the amount which you set forth, $650,000, and the prudent purchaser would pay that amount? A. [Mr. Hastings] I found transactions in which buyers and sellers agreed at approximately the same ratio that I have used as a capitalization rate. Furthermore, the benefits of ownership diminish the older the project gets, because, again, of the tax shelter.

"Mr. Renda: I think that's all.

"The Court: Now, I want to be sure. You said you found comparable examples. Don't you get into comparable sales when you consider that factor?

"The Witness: Well, Your Honor, it does take an analysis of looking into transactions of similarly restricted, similarly financed projects.

"The Court: I think this answer has got to be stricken, and the jury has got to be instructed to disregard it on the basis of what I told you what the stipulation was.

"I explained to you very carefully you are not, under any circumstances, to consider comparable sales.

"The answer may be stricken and the jury instructed to disregard it.

"Mr. Renda: May I approach the bench?

"The Court: Yes, sir. (The following proceedings were had at the bench out of the hearing of the jury.)

"Mr. Renda: If Your Honor please, I am becoming rather confused here, and I would like to straighten out my own thinking. As I understand it, I have stipulated that the Government will proffer no comparable sales, and by that I mean we will not allege that because Project X is similar in size, location, et cetera, to our project, that the sale of that project is indicative of the market value of our project here. That is what I understood.

"The Court: This is exactly what he has gone against in this last statement. He has indicated, in answer to your question as to how he considered, what various factors the prudent seller would consider.

"I will ask him specifically what sales he had in mind. (The following proceedings were had in the hearing of the jury.)

"The Court: What specific instances did you have in mind when you answered that last question that a prudent seller would take into consideration?

"The Witness: I have analyzed a large number of—

"The Court: Well, you specifically name which ones you took into consideration—of sales.

"The Witness: Title 9 housing project. That's a war housing project.

"The Court: That sale was made when?

"The Witness: March 1, 1958.

"The Court: In what locality?

"The Witness: Kansas City, Kansas.

"The Court: You took that into consideration?

"The Witness: No, sir; I took the ratio of the selling price to the income.

It would seem apparent that if a capitalization rate is to be set, it should be ascertained by reference to the *best* evidence—the most similar property—as well as dissimilar investments, if that proves necessary. "The selection of a capitalization rate by comparison is perhaps the most widely accepted approach. It recognizes the behavioristic nature of economics, because by comparison one gets the reaction of people in the market place.[5]" And see United States v. Delano Park Homes, 2 Cir., 1944, 146 F.2d 473, in which Judge Learned Hand, for the court, stated that one of the points raised on appeal was "(3) that the testimony of an expert witness was allowed to stand, after it appeared upon cross-examination that he had in part based his appraisal upon sales made to the United States under the shadow of condemnation." These sales were expressly assumed by Judge Hand to be inadmissible under New York law (which was the applicable law) but

> "Be that as it may, it would be absurd to exclude a qualified expert's appraisal because he had considered

such evidence; indeed he ought to consider it; it is part of the data on which his opinion should rest. It is just because he is an expert, and for that reason able to give its proper weight to all data, that he is allowed to appraise the property at all. No court has held, so far as we can find, that his opinion shall not be received because it is so based in part; and we should not follow its ruling, if there were one, unless we had no escape." 146 F.2d at page 475.

That the stipulation must be construed to embrace only (1) and not (2), above, is evident from the explicit statement made by counsel for the government immediately after the stipulation at the pre-trial conference—a statement which went unquestioned by the defendants. Mr. Renda said:

> "Yes, Your Honor, and it is for that purpose [to save time] that I am taking this step [stipulating]. *However, I do urge upon the Court that the experts of the Government have, in considering what the market*

(The following proceedings were had out of the hearing of the jury.)

"Mr. Renda: Your Honor, may I make this statement: Again, in order to ascertain what the investment return would be, you have to look to similar investments. Now, to look to similar investments—

"The Court: That isn't what he said in his answer. He was talking about investments; he was talking about one thing; but talking about what a prudent seller would take into consideration in reference to what sales would bring; that is quite another thing. (Colloquy inaudible to the reporter.)

"The Court: I am going to go into it further myself. (The following proceedings were had within the hearing of the jury.)

"The Court: Now, when you took into consideration these other transactions, do I understand that you took into consideration what the purchaser paid for these projects?

"The Witness: The price paid for the project in relation to the amount of net operating income.

"The Court: Yes; so that you were actually considering what a purchaser

was willing to pay in purchasing this type of an equity?

"The Witness: Yes, sir, Your Honor, but in relation to any investment—

"The Court: The answer may be stricken out and the jury instructed to disregard it.

"Mr. Williamson: At this time we would like to move that the testimony of the witness be stricken out.

"The Court: The motion is denied." (Tr. 906–09)

It can be seen that some confusion existed as to whether Hastings was testifying in category (1) or category (2). The last question put to him by the government related to a dollar figure, not a rate. His later answer—"No sir; *I took the ratio of* the selling price to the income."—should have made clear that the witness had not violated the stipulation. In any event, the defendants are in no position to complain of the ruling since, of course, it was not to their prejudice but, if of any effect, to their benefit.

5. "The Appraisal of Real Estate" 375 (1951 ed.).

*rate of return would be for this type of investment, investigated the sales mentioned, as well as other sales of similarly regulated and restricted types of property.*

"Now, as the Court is undoubtedly aware, when an investor has a sum of money which he desires to place in an investment, he will look to similar types of investments to the one he is interested in to see whether or not he can get a better rate of return in order to justify the asking price or the offering price. This is what any prudent purchaser would do. And in the situation that we have here, where we have the hypothetical sale of our particular project, the question before the experts is, and as it will be presented to the jury: What would the prudent investor do? What would he pay for this property? And it is the opinion of the Government experts that the investor in this type of project would look to similar investments of similarly regulated and controlled type of projects, which would include 608's, 207's and Wherry projects, to find the rate of return * * *".

(Tr. ptc 125.)

Furthermore, it appears that even the defendants' expert witness considered real estate investments in fixing his capitalization rate, although it should be added that he did not think these real estate investments comparable.

"Q. [Mr. Williamson] Now, what are the sources of capitalization rates generally? A. [Mr. Vaughan] Well, you investigate what you might call the money market statistically to find out what investments are earning as of the dates you are concerned with.

"Q. Did you make such an investigation? A. Yes, sir; I did.

"Q. Would you describe such fields or financial experience as you have found available for you to examine into? [A discussion of stocks and bonds and their yield followed.]

"Q. Now, was there available to you any other indicator or criteria of value which you were able to employ in this case? A. Well, from personal experience. I had occasion to negotiate leases and assist in the preparation of leases of real estate in which the rate of return was critical—both the rate of return and the period of time over which the owner was to get his investment back.

"I could rely upon my own information and work I had done personally in the field, as well as statistical data.

"Then going back to the fact that we are dealing with a completely unique project in my experience, this is a property which is being taken over, occupied and in business and in operation, to continue in that operation.

"In the history of it I attempted to put myself in the position of an investor back to the days that these Wherry Projects were conceived and went into effect. * * *" (Tr. 362–364.)

On cross-examination, Vaughan's testimony went as follows:

"Q. [Mr. Renda] In your investigation of similar investments, Mr. Vaughan, you mentioned yesterday that you considered U. S. Government bonds and certain stocks, etc. *Did you give consideration to various types of investments incorporating a similar type of housing; by that I mean housing that has similar restrictions by FHA and similar type of insured loans and for a similar purpose. A. I did not consider them comparable because you get into one area where the Wherry is unique.* In the first place, it is located upon land owned by the Government at a very nominal rental; it is occupied by military personnel assigned by the base officer. There are many, many factors involved in a Wherry which I think make them different than 608's and provide

more security. I know of one instance in one of these Wherry projects where a 608 went broke when they moved part of the military away from the base and the Wherry was still 100% occupied.

"Q. Then you did not give consideration to 908's, 608's or 207's in your investigation of what an investor would require, by way of return?

"Mr. Williamson: May we approach the bench? (The following proceedings took place out of the hearing of the jury.)

"Mr. Williamson: The rule in U. S. v. Laughlin [Sic: Loughran v. U. S., 62 App.D.C. 57, 64 F.2d 555 (1932)] cited by the owners in their brief and in the face of the stipulation made by counsel, is that the attempt to inject into the case sales that are not comparable by cross-examination, for any purpose, is improper.

"The Court: I don't think that is his purpose, Mr. Williamson. You can't restrict him on cross-examination to interrogating just what factors Mr. Vaughan took into consideration. He has indicated he took into consideration certain investments in U. S. bonds and investments in insurance companies and certain other investments.

"Mr. Dickey: In building up his capitalization rates, Your Honor.

"The Court: I understand. I assume that is what he is asking about on cross-examination. An attempt to indicate he should have taken into consideration other investments as well; he has a right to ask that.

"Mr. Williamson: We do have a stipulation that there were no comparable sales.

"The Court: Oh, yes.

"Mr. Renda: I am not going into that.

"The Court: I don't think this strikes down that stipulation. I

think this is within the realm of cross-examination on value.

"Mr. Williamson: All right, Your Honor.

"The Court: It is a matter of argument again. (The following proceedings were had in the presence of the jury.)

"Mr. Renda: Q. *I take it then, Mr. Vaughan, that you did not analyze those types of investment in your investigation? A. I reviewed some data related to them, but I did not consider them comparable.*" (Tr. 457–460.)

Of course, if Vaughan is correct and "the Wherry is unique", there are no comparable properties and it would have been impossible to violate the stipulation directly or indirectly—indeed, the stipulation would have been unnecessary. On the other hand, if he is incorrect and the property is comparable, having "reviewed some data related to them", he utilized comparable sales in the same way as did the government's witnesses.

■ Defendants have also argued that a witness, Ralph F. Clark, had been subpoenaed but did not testify because the defendants considered his testimony improper and superfluous in light of the stipulation. The contention now is that Clark's testimony is "newly discovered" and thus a ground for granting a new trial. But the evidence Clark would give was known at the time of the trial and was not presented as a matter of defendants' trial tactics. Furthermore, it appears that its principal purpose was to attack the credibility of witnesses for the government. Under the circumstances, it does not supply a sufficient reason to grant a new trial. Pittsburgh Reduction Co. v. Cowles Electric Smelting & Aluminum Co., C.C.N,D.Ohio, E.D. 1894, 64 F. 125; Casey v. United States, 9 Cir., 1927, 20 F.2d 752, affirmed 1928, 276 U.S. 413, 48 S.Ct. 373, 72 L.Ed. 632; 6 Moore's Federal Practice 3783–3791 (2nd ed. 1953).

■ A further contention is that the misconduct of a juror "contributes" to

the granting of a new trial. Towards the close of the trial, one of defendants' counsel informed the Court, as his affidavit reads, that he "saw one of the jurors in the cause then in trial * * * and after an exchange of pleasantries, was informed by [her] that she intended to read a 'hilarious passage regarding appraisals' to her fellow jurors from a book on real estate appraisals which she had been reading." Counsel did not advise the juror about the matter, but thought it best, instead, immediately to notify the Court of the occurrence. A conference was held in chambers and all agreed that it was not necessary to discharge the juror; an admonishment by the Court to the jurors not to consider any material not in evidence, would be sufficient. Defendants were apparently satisfied with this procedure and nothing further was said about the matter until the verdict was returned. It is questionable whether the above incident amounts to anything; more importantly, the procedure followed was agreed upon by all concerned and should not be complained of at this time.

Defendants have pointed to alleged defects in the charge given the jury. At the conclusion of the charge, the defendants made no formal objection to anything—with the exception that it was thought the leasehold acquired some additional value by reason of defendants having paid only $200 rental for the land, a point not pressed on this motion. Nevertheless, the Court has carefully examined the entire record, and carefully considered the arguments advanced; it concludes the charge was fair and correct.

The Court has carefully examined the other contentions of the defendants and has found them insufficient for the awarding of a new trial. This was a jury case—at the request of both sides. Much expert testimony was adduced, all the experts agreeing that a slight variation in the capitalization rate or income figure

worked an extensive change in the final figure and that there was an area of judgment with regard to these determinants within which conscientious experts could disagree.[6] In appreciation of this elusive nature of "fair market value", the Court permitted liberal cross-examination. The jury returned its verdict within the limits placed by the parties; it was neither excessive nor inadequate as a matter of law and the Court concludes it must not be disturbed.

The defendants' motion for a new trial, or in the alternative, for judgment notwithstanding the verdict is denied.

---

**6.** And see the revealing statistics in an enlightening comment, "Eminent Domain Valuations in an Age of Redevelopment: Incidental Losses", 67 Yale L.J. 61, 73, n. 55, n. 56 (1957).