**UNITED STATES of America,** Petitioner-Plaintiff-Appellee,

v.

**CERTAIN INTERESTS IN PROPERTY IN the BOROUGH OF BROOKLYN, COUNTY OF KINGS, STATE OF NEW YORK, and Dayton Development Fort Hamilton Corp. and Fort Hamilton Manor, Inc., Defendants-Appellants.**

No. 113, Docket 27994.

United States Court of Appeals Second Circuit.

Argued Nov. 15, 1963.

Decided Jan. 9, 1964.

Edmund B. Clark, Dept. of Justice, Washington, D. C. (Ramsey Clark, Asst. Atty. Gen., Harry T. Dolan, Sp. Asst. to the Atty. Gen., Brooklyn, N. Y., and Roger P. Marquis, Washington, D. C., on the brief), for petitioner-plaintiff-appellee.

Bernard L. Bermant of Skinner, Bermant, Leddy & Raber, New York City (Carl J. Moskowitz, New York City, on the brief; George B. Kenner, New York City, co-attorney), for defendants-appellants.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

HAYS, Circuit Judge:

Defendants, Fort Hamilton Manor, Inc., and Dayton Development Fort Hamilton Corporation, appeal from judgments entered in a proceeding for the condemnation of their leasehold interests in certain housing projects constructed under the Wherry Housing Act, 63 Stat. 570 (1949), 12 U.S.C. § 1748 et seq. (1958), as amended, 73 Stat. 682 (1959), 12 U. S.C. § 1748 et seq. (Supp. IV 1959–62). We affirm.

Congress passed the Wherry Act in 1949 to encourage the construction of low-cost military housing by private enterprise. Inducements to private builders included government insured mortgages of 90% of estimated cost of construction, without regard to the risk, and elimination of land acquisition costs

through the leasing of government owned military sites at nominal or very low rentals. In return for these benefits and to ensure the realization of the objective of providing housing at rentals military personnel could afford, the mortgagors were made subject to Federal Housing Authority regulation of rents, charges, capital structure, rate of return, and methods of operation.

Fort Hamilton Manor, Inc., and Dayton Development Fort Hamilton Corporation, sister corporations, constructed Wherry Act Housing projects on government land at Fort Hamilton, Brooklyn, New York, under two 75-year leases. Together, the two projects comprise five six-story, elevator apartments, with a total of 682 rentable units.

In 1955, Congress adopted a new approach to military housing. The Capehart Act, 69 Stat. 651 (1955), as amended, 42 U.S.C. §§ 1594–1594j (1958), provided for government construction of new housing and made mandatory the acquisition by the United States of Wherry Act projects located at military installations where Capehart housing was approved. On December 15, 1960, the United States instituted condemnation proceedings with respect to the Fort Hamilton housing by filing a declaration of taking and by depositing into court $1,250,000 as estimated compensation. The United States took possession on February 1, 1961.[1]

Wherry leaseholds have unique features that render difficult the direct determination of market value, the usual measure of just compensation in condemnation cases. The leases themselves cannot be transferred and thus have no "market value." Although sale of a Wherry leasehold can be effected indirectly by sale of the stock in the mortgagor corporation, such sales have been infrequent. Because of the special risk-reducing features of Wherry leases, sales of other leaseholds are not readily comparable.

On the other hand, Wherry leases are particularly amenable to the capitalization of income method of valuation, which estimates the market price of the right to receive a certain estimated income, since the regulation to which the projects are subject permits a relatively precise estimate of future income. At the beginning of the lease, maximum rentals are established that will restrict net income, after operating expenses and taxes, to less than 6.5% of the estimated cost of construction. If operating costs increase or the rate of occupancy changes significantly, the regulations permit a redetermination of maximum rentals,

1. In a prior appeal, United States v. Certain Interests in Property Situate in Borough of Brooklyn, 302 F.2d 201 (2d Cir. 1962), this court held that the United States was entitled to the rental value of the premises from the date of taking, when title vested in the government, to the date when the government was awarded possession, and remanded for a determination of rental value. In the trial below the jury awarded the government rentals of $14,502 against Dayton Development and $42,616 against Fort Hamilton Manor. These amounts paralleled the government's estimate, which was based on what the *long-term* lease rentals would have been for the period, with adjustments for seasonal factors such as heating costs and for incidental income. Defendants contend that the government's evidence was insubstantial as a matter of law as an estimate of the value of the *temporary* term

and that the court erroneously prevented them from cross-examining the government's expert regarding actual receipts and expenditures for the period. In United States v. General Motors Corp., 323 U.S. 373, 382–383, 65 S.Ct. 357, 89 L.Ed. 311 (1945) the Court stated that long-term rental value may be evidence of the value of a temporary occupancy. In the present case the government's expert took into account factors peculiar to the temporary occupancy, and his testimony afforded sufficient justification for the jury finding. Defendants introduced no evidence concerning actual receipts and expenditures, although they were in the best position to do so. Therefore they cannot complain of not having been allowed to cross-examine the government's witness as to such information, information which he had not used in reaching his estimate of rental value.

with the result that net income remains virtually constant over the period of the lease.

At the trial, the parties' appraisal experts, both of whom used the capitalization of income method, were in substantial agreement as to the amount of income to be capitalized. Their principal disagreement concerned the rate of return at which the capitalization was to be computed, the government witness adopting a higher rate of return and thus a lower capitalized value. The jury apparently accepted the opinion of the government expert, for their verdict ($200,000 for the Dayton Development leasehold and $675,000 for Fort Hamilton) adopted his appraisal to the penny.[2]

Defendants contend that the testimony of the government witness, Shlichta, was insufficient to support the verdict because it was based on evidence, which defendants claim was inadmissible, concerning sales of stock[3] in Wherry corporations and FHA "608" housing corporations, National Housing Act § 608, 56 Stat. 303 (1942), as amended, 12 U.S.C. § 1743 (1958). The Wherry leaseholds as to which Shlichta testified were located in relatively isolated surroundings near Fort Devons, Massachusetts, Barksdale, Louisiana, and Quantico, Virginia, and covered frame buildings rather than six-story apartments as at Fort Hamilton. The FHA rent-controlled projects were located near Fort Hamilton and were substantially similar in construction to the Fort Hamilton developments. Rentals in these projects were lower than those in uncontrolled neighborhood apartment buildings but above the maximum for defendants' projects.

Defendants argue that evidence of such sales is not admissible unless the properties are comparable to that being valued and that because of the differences which we have described the properties were incomparable as a matter of law. For this conclusion they rely on Fairfield Gardens, Inc. v. United States, 306 F.2d 167, 170–173 (9th Cir. 1962), United States v. 190.71 Acres of Land in Lake County, Ill. [Forrestal Village], 300 F.2d 52, 59–62 (7th Cir. 1962), and United States v. Tampa Bay Garden Apartments, Inc., 294 F.2d 598, 605 (5th Cir. 1961), which held that the trial court had not abused its discretion in excluding evidence of these same Wherry sales, and, in the Fairfield Gardens case, evidence of sales of nearby FHA "608" leaseholds.

Since comparability is essentially a question of fact, trial judges exercise broad discretion in ruling on the admissibility of proof of comparable sales. As the court stated in Forrestal Village, supra, 300 F.2d at 60, " 'It is traditional that the question whether the compared property is truly comparable is for the judge to decide.' " Thus the cases cited by defendant do not require reversal of a trial judge who exercises his discretion to admit, rather than exclude, the challenged evidence.

Moreover, in the cases cited by defendants, the evidence as to comparable sales was offered as direct proof of value, whereas in the present case the government used the evidence of comparable sales not directly as proof of value but only to establish the ratio between income and sale price, i. e., as support for its estimate of the appropriate rate of return. We think there is sufficient similarity of risk to permit reference to the sales for that purpose. Although differences in durability of construction (which may affect the risk that physical deterioration will reduce income-producing capability), in proximity to civilian population centers (which provide alternative sources of tenants should the military installation be closed), and in the margin between the controlled and

---

2. As the government's deposit, which had been withdrawn by defendants, exceeded the verdict, a deficiency judgment was entered in favor of the government.

3. Since Wherry corporations are precluded from engaging in any business other than the operation of Wherry leaseholds, the consideration given for the stock can be regarded as the price paid for the underlying leasehold.

competitive uncontrolled rentals (which affords a cushion against a downward price trend) are factors creating a dissimilarity of risk, they operate over the long-term and are concerned with relatively speculative aspects. The compared leaseholds are alike in the more immediate, and more important, elements of low rentals, low mortgage interest rates, high mortgage coverage, and stable rental income. Taking all factors into consideration, we hold that the trial judge acted within his discretion in admitting the testimony. See United States v. Delano Park Homes, Inc., 146 F.2d 473, 474–475 (2d Cir. 1944); United States v. Tampa Bay Garden Apartments, Inc., supra, 294 F.2d at 605; United States v. Johnson, 285 F.2d 35, 40–41 (9th Cir. 1960); United States v. Certain Interests in Property in Monterey County, Cal., 186 F.Supp. 167, 169–170 (N.D.Cal.1960), aff'd sub nom. Likins-Foster Monterey Corp. v. United States, 308 F.2d 595, 599 (9th Cir. 1962).

■■ Defendants argue that it was error to exclude evidence [4] concerning current reproduction costs less depreciation, because such evidence was admissible under both federal decisions and under state decisions allegedly made applicable by Rule 43(a) of the Federal Rules of Civil Procedure.[5] We look only to the federal decisions, because the propriety of basing an estimate of value on reproduction cost less depreciation involves a substantive rule of law rather than an evidentiary question governed by Rule 43(a), see United States v. Certain Property Located in Borough of Manhattan, 306 F.2d 439, 444 (2d Cir. 1962); cf. Westchester County Park Commission v. United States, 143 F.2d 688, 693–694 (2d Cir.), cert. denied, 323 U.S. 726, 65 S.Ct. 59, 89 L.Ed. 583 (1944), and because, in any event, the peculiarities of Wherry projects render the state decisions inapposite.

■ It cannot be seriously argued that evidence of reproduction cost was admissible as direct proof of value. The interest being condemned is essentially the prospect of receiving a certain income based on the original cost of the

---

4. Defendants also contend that it was error for the court to exclude an FHA circular letter offered to buttress the testimony of their expert Tuchler.

On cross-examination of Tuchler the government brought out that he had accepted the project analysis figures of 6.4% and 6.1% as the "rate of return to which the parties had agreed," without calculating the actual rate himself, and that in fact the ratio of allowable income to estimated original cost was 6.65% for Fort Hamilton Manor and 6.32% for Dayton Development, a revelation that reflected adversely on Tuchler's competence as an expert. The next day defendants offered in evidence the FHA circular letter which instructed the Federal Housing Authority's Chief Underwriters that whenever the ground rental was more than a nominal sum they should include in the estimate of original cost of construction a value for land based on the capitalized value of the ground rental. The trial judge excluded the proffered evidence and charged the jury that land value was not to be considered.

The letter was not relevant evidence for the purpose of re-establishing Tuch-

ler's status as an expert, since he had not relied on it as a basis for his estimate.

With regards to the correctness of the 6.1% and 6.4% figures, the letter merely permits the speculation that a value for land was included when the computation was made, a speculation directly contrary to the estimate of original cost of construction in the project analysis, which showed land value at zero. In any event, defendants were not prejudiced by exclusion of the letter, since the court charged the jury that 6.5% was the legal maximum and the jury nevertheless accepted an appraisal based on a higher rate of return.

5. "All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs * * *." Fed.R.Civ.P. 43(a).

property. Fluctuations in costs of construction would afford no basis for an increase in rentals. "The [Wherry] Act did not contemplate that sponsors would recover reproduction costs on a sharply rising market." United States v. Benning Housing Corp., 276 F.2d 248, 253 (5th Cir. 1960). See also United States v. Leavell & Ponder, Inc., 286 F.2d 398, 401 (5th Cir.), cert. denied, 366 U.S. 944, 81 S.Ct. 1674, 6 L.Ed.2d 855 (1961); Buena Vista Homes, Inc. v. United States, 281 F.2d 476, 478 (10th Cir. 1960).

Defendants assert, in reliance on Fairfield Gardens, Inc. v. United States, 306 F.2d 167 (9th Cir. 1962), that reproduction cost may be admitted for its indirect effect as background for an expert's testimony. Their argument, however, is markedly weaker than the government's similar argument for the admission of the comparable sales evidence. Defendants' reproduction cost less depreciation estimate was simply an alternative method of valuation offered as corroboration of the capitalization of income method, while the comparable sales information was integral to the capitalization approach since it was used in selecting the appropriate rate of return.

Defendants' reliance on Fairfield Gardens, supra, is misplaced. That case did not hold that reproduction cost testimony must be admitted. Indeed, the court carefully distinguished a prior decision, Carlstrom v. United States, 275 F.2d 802, 808 (9th Cir. 1960), that had sustained the trial court's exclusion of reproduction cost evidence offered in support of expert testimony. Fairfield Gardens did uphold a jury charge that reproduction cost could be considered as corroboration for expert testimony if it had been shown that "a reasonable, prudent person would reproduce the project, on the valuation date, for the amount given as reproduction cost." 306 F.2d at 174. No such showing having been made here, it was not an abuse of discretion to exclude the proffered evidence. "It is the primary responsibility of the trial court to determine whether reproduction cost evidence should be admitted as an aid to valuation." United States v. Benning Housing Corp., supra, 276 F.2d at 251.

■ Defendants also object to the treatment of a replacement fund and of certain repair costs. Wherry leases require the lessee to make annual contributions to a replacement fund, which acts as security to the mortgagee that necessary replacements, such as stoves and refrigerators, will be made. In practice expenditures for replacements may be made either out of the replacement fund or out of separate funds of the lessee. Prior to trial the government had assumed the obligation of replacement, and the replacement fund, which then amounted to approximately $170,000 for the two projects, was withdrawn by defendants with the government's permission. In reaching his final estimate the government's expert witness capitalized the net income at 7.5%, the rate of return drawn from the comparable sales, and then deducted the $170,000 for the replacement fund and an additional $80,-000 for repairs not covered by the replacement fund that he thought immediately necessary to preserve the income producing capabilities of the properties. Defendants contend that these adjustments duplicated the deductions of annual maintenance and of the annual contribution to the replacement fund which both experts allowed as expenses in computing estimated income. We hold that deduction of the replacement fund and of the item for repairs was proper.

■ The assumption of the capitalization of income method is that the property will sustain throughout the life of the lease the level of income used as a base for the capitalization. Items of extraordinary expense necessary to maintain that level of income and not accounted for as deductions in the computation of anticipated annual earnings must therefore be subtracted from the appraiser's estimate of value. The repairs item was such a deduction for deferred improvements covered neither by the replacement fund nor by future mainte-

nance charges. See Carlstrom v. United
States, 275 F.2d 802, 808 (9th Cir. 1960).
The replacement fund has the effect of
averaging certain expense over the peri-
od of the entire lease. Because the $170,-
000 in the replacement fund presumably
is the excess of contributions over re-
placements in the past period, contribu-
tions to the replacement fund for the
period subsequent to the condemnation
will not allow for all the replacements
that will occur during that period. Thus
the replacement fund must be deducted
to compensate for the failure of the ex-
perts to deduct from future income the
full amount of future replacement costs.
As to the past period, appellants did not
show that the fund included the cost of
any replacements which were not paid
for by withdrawals from the fund.[6]

▆▆ The record discloses that de-
fendants were not given a full oppor-
tunity to explain the bases upon which
objections were raised to the court's

charge. Although in this case defend-
ants were not prejudiced since the court
was undoubtedly cognizant of defend-
ants' position—which had been explained
during the trial in numerous colloquies
between counsel and the bench and in de-
fendants' requests to charge—and the
court committed no reversible error in
its charge, we emphasize that Rule 51 of
the Rules of Civil Procedure explicitly
permits a party to state "distinctly the
matter to which he objects and the
grounds of his objection." One signifi-
cant purpose of the rule is to allow the
district judge to correct any errors in his
charge brought to his attention by any
of the parties. Unless the court permits
the parties to explain their objections,
this important purpose of Rule 51 cannot
be effectuated.

▆▆ We have considered the other
contentions of defendants [7] and find no
error.

Affirmed.

6. Another government witness, Mr. Bing-
ham, testified that the property needed
repairs and replacements totaling $450,-
000. Since Shlichta deducted only $80,-
000 for repairs, defendants claim that
Bingham's testimony was irrelevant and
that it prejudiced them by giving the
jury the allegedly erroneous impression
that the property was deteriorated and
in disrepair. Such testimony, however,
was relevant to establish the alternative
basis for deducting the replacement fund
that replacements were immediately re-
quired. Compare Buena Vista Homes,
Inc. v. United States, 281 F.2d 476, 478–
480 (10th Cir. 1960), with United States
v. 190.71 Acres of Land in Lake County,
Ill., 300 F.2d 52, 64–65 (7th Cir. 1962).
Moreover, although defendants moved to
strike portions of Bingham's testimony
as hearsay, we do not find in the rec-
ord any objection to Bingham's testi-
mony on the ground that it was not re-
lied on by Schlichta. Courts have fre-
quently upheld relaxation of the hearsay
rule to permit an expert to testify con-

cerning the basis of his opinion. United
States v. 18.46 Acres of Land, More or
Less, Situate in the Town of Swanton,
Vt., 312 F.2d 287 (2d Cir. 1963); United
States v. 5139.5 Acres of Land, in Aik-
en and Barnwell Counties, S.C., 200 F.
2d 659, 662 (4th Cir. 1952).

7. The defendants find error in the judge's
charge that it was undisputed that de-
fendants had received a windfall, i. e.,
the amount of the mortgage was greater
than the actual cost of construction.
Not only was this untrue but whether
defendants had received a windfall was
totally irrelevant to determination of the
present value of the leasehold although
it might affect the jury's attitude toward
defendants. However, Shlichta's testi-
mony presented the matter accurately
and fairly. If the defendants had not
insisted on emphasizing the issue, there
would be no question at all of prejudice.
In the light of the record as a whole,
the charge was not sufficiently prejudi-
cial to justify upsetting the verdict.