447 F.2d 764
 UNITED STATES of America, Appellant and Cross-Appellee,
v.
967,905 ACRES OF LAND, MORE OR LESS, Situate IN COOK, ET AL., COUNTIES, STATE OF MINNESOTA, et al., Jacob L. Pete and James W. Pete, Appellees and Cross-Appellants.
 No. 20709.
 No. 20710.
 United States Court of Appeals, Eighth Circuit.
 August 25, 1971.
 Rehearing Denied September 23, 1971.
 As Modified October 1, 1971.
 
 1
 Solly Robins, Steven H. Goldberg, Robins, Davis & Lyons, St. Paul, Minn., for appellees and cross-appellants, Jacob and James Pete.
 
 
 2
 Carl Strass, Atty., Land and Natural Resources Div., Dept. of Justice, Washington, D. C., Shiro Kashiwa, Asst. Atty. Gen., Robert G. Renner, U. S. Atty., Thorwald D. Anderson, Jr., Asst. U. S. Atty., Minneapolis, Minn., Edmund B. Clark, Atty., Department of Justice, Washington, D. C., for appellant.
 
 
 3
 Before MATTHES, Chief Judge, GIBSON, Circuit Judge, and HENLEY, District Judge.*
 
 
 4
 HENLEY, Chief District Judge.
 
 
 5
 These cases represent an appeal and cross appeal from a final judgment of the United States District Court for the District of Minnesota awarding just compensation in an eminent domain case. The Government is appellant and the landowners are appellees in the basic appeal; their positions are reversed in the cross appeal.
 
 
 6
 The land involved which we will refer to as Tract 3520 or as "the Pete property" is located on Hoist Bay in Basswood Lake which is a large body of navigable water located on the Minnesota-Canadian boundary. The Lake is practically landlocked; part of its shore line is located in Minnesota, and the rest of it is in Canada. The Lake is located in the Superior National Forest and is included in a wilderness area known as the Boundary Waters Canoe Area; the Forest and Canoe Area are administered by the Forest Service of the United States Department of Agriculture.[1]
 
 
 7
 The question of how much the Government must pay for the taking of the tract in question has been the subject of two protracted jury trials and has produced several memorandum opinions of the District Court, one of which, filed between the first trial and the second trial, appears in 305 F.Supp. 83 (1969). That opinion contains an excellent description of the Boundary Waters Canoe Area and of Government action in connection with the Area. The opinion also contains a full statement of the background facts of the case.
 
 
 8
 For many years Jacob L. Pete and his son, James W. Pete, operated a sports fishing and hunting resort on Hoist Bay using Tract 3520 as a base of operations. Tract 3520 consists of two parcels of noncontiguous land. The larger parcel contains 40 acres of unimproved land traversed by what is known as Four Mile Portage. The smaller parcel, described at times as Government Lot 6, contains a few acres of land that had been improved by the Petes by the erection of certain buildings and structures as the living quarters of themselves and their families and for the accommodation of visiting hunters and fishermen. The Petes owned only an undivided one-fourth interest in the lands; the other interest was owned by the Izaak Walton League of America Endowment.[2] However, the Petes owned all of the improvements on Government Lot 6, and they made use of all of the property without paying rent to the League and without accounting to the League for any profits from their commercial operations.
 
 
 9
 In connection with their business the Petes owned and operated three large cabin barges or houseboats capable of transporting large parties of fishermen from place to place on Basswood Lake and of accommodating them over night and for several days at a time. Pete clients would embark on the barges where they would remain during their stays, traversing the Lake and doing their actual fishing from smaller boats which when not in actual use would be moored to or towed by the barges.[3]
 
 
 10
 On December 21, 1965, the Forest Service acting under statutory authority promulgated regulations designed sharply to curtail or prohibit altogether commercial operations in the Canoe Area such as those of the Petes. 30 F.R. 15,738, 36 C.F.R. § 251.85. This action was commenced on January 20, 1966. On that day the Government filed its complaint and declaration of taking and obtained from the District Court an order authorizing it to take immediate possession of Tract 3520. At about the same time the Government acquired all of the other privately owned land on the American side of Basswood Lake, and the Canadian Government acquired all of the privately owned land on the Canadian shore of the Lake.
 
 
 11
 That action which was ultimately to destroy the business of the Petes created quite a problem about the barges, which for convenience we will call simply the "boats," since they would be deprived of any land base on the Lake and since, according to the finding of the District Court, they could not be removed from the Lake except at prohibitive cost. The Petes claim that they are entitled to be compensated for the boats in this action; the Government says that it is not required to pay for the boats.
 
 
 12
 Although the order of possession issued by the District Court in January 1966 required the Petes to yield possession immediately, the Forest Service took no steps to obtain immediate possession. On the contrary there was an agreement between the Forest Service and the Petes whereby the latter were permitted to remain in possession of Tract 3520 and to continue their commercial operations which included the use of the boats. The understanding between the Forest Service and the Petes was oral, and the record does not disclose its precise terms or the precise motivation of the Service in permitting the Petes to remain and continue to operate on the Lake. The understanding did not include any requirement that the Petes pay the Government any rent, and they have never paid or tendered any. No demand for rent was made by the Government until after the first trial.
 
 
 13
 Prior to the first trial the District Court determined, and has adhered consistently to its determination, that it was not feasible to remove the boats from the Lake, that they were "fixtures" "constructively joined" to the realty, and that they should be considered as part of the realty and taken into consideration by the jury in valuing the land.
 
 
 14
 The first trial of the case took place in June and July, 1969, and the jury was instructed in detail as to the law that would govern it in its deliberations. However, the instructions did not incorporate the rule laid down in United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967), to the effect that where lands riparian to navigable waters are condemned by the Government the landowner is not entitled to be compensated for his lands above ordinary high water mark on the basis of any enhanced value due to their access to the water.[4]
 
 
 15
 The first jury found that the portion of Tract 3520 identified as Government Lot 6 had a value, as enhanced by the boats of $149,000 and that without the boats being considered the value of the land and improvements thereon was $64,000.
 
 
 16
 On September 11, 1969, the District Court ordered the Clerk to enter judgment based on the $149,000 valuation and in that connection filed its memorandum opinion that was published and has been cited heretofore. In that opinion the Court set out the reasoning which led it to its conclusion that the boats should be considered as part of the realty.
 
 
 17
 In the course of the first trial the Government undertook to show the value of the tract by the capitalization of income method of valuation, and its expert used a capitalization rate of 7 percent per annum. On September 22 the Government filed a motion for an allowance of rent at the annual rate of 7 percent of the award for the period of time during which the Petes had remained in possession of their properties after the taking[5] and also filed other motions including an alternative motion for a new trial.
 
 
 18
 In January 1970 the District Court ruled on all motions pending before it. The Court renewed its holding that the boats were part of the real estate and were compensable, and it denied the Government's claim for rent. However, the Court concluded that it had erred in not applying Rands, supra, and ordered a new trial to correct its supposed error in that regard. But, the Court was not willing to apply Rands to the improvements on the tract including the boats.
 
 
 19
 The second trial took place in June 1970 and resulted in a verdict as to Lot 6 in the sum of $140,500 with the boats being included in the valuation. The second jury was not asked to value the tract without the boats. However, it was called upon to value the 40-acre portion of Tract 3520 separately, and it valued that portion at $1,000; the 40-acre valuation is not at issue in this appeal.
 
 
 20
 Both sides filed post-trial motions which the Court considered and denied on August 11, 1970. These appeals followed, and the case is properly before us.[6]
 
 
 21
 As appellant in No. 20,709 the Government contends that the District Court erred in allowing compensation for the boats, and in limiting its application of Rands to the lands themselves while refusing to apply that case to the improvements, and in refusing the Government's prayer for rent.
 
 
 22
 As appellants in No. 20,710 the landowners urge that the District Court should not have applied Rands to the lands, and that it erred in so doing.
 
 
 23
 For reasons to be stated we reverse on both appeal and cross appeal and remand the case for appropriate proceedings including a new trial if the parties are not able to come to an amicable settlement.
 
 I.
 
 24
 Taking up, first, the controversy about the boats, we hold that the District Court permissibly found that due to their size, shape, and weight the boats could not have been removed from the Lake without dismantling them completely, carrying the pieces across Four Mile Portage and then reassembling the boats, and that the cost of such a procedure would have been prohibitive.
 
 
 25
 The landowners did not contend in the District Court nor do they contend here that they are entitled to compensation for the boats, treated as personal property, on the basis of the fact that the actions of our Government and of the Government of Canada which have been described effectively denied the landowners use of the boats and destroyed their economic utility so that in a broad sense it might be said that the Government had "taken" the boats. Whether such a theory would have prevailed had the Petes sought relief in the Court of Claims is a question upon which we need not speculate; the possibility of such relief was suggested by the District Court in its published opinion. 305 F.Supp. at 91-93.
 
 
 26
 As the District Court recognized, 305 F.Supp. at 92, when the Government condemns real estate only, it is not required to pay for personal property or for the cost of removing personal property from the land. United States v. General Motors Corporation, 323 U.S. 373, 65 S. Ct. 357, 89 L.Ed. 311 (1944); Sykes v. United States, 8 Cir., 392 F.2d 735 (1968). Hence, the landowners must stand or fall on their proposition that in the rather peculiar circumstances of this case the boats are to be considered as part of the real estate that the Government condemned.
 
 
 27
 In determining that the boats were part of the realty the District Court adopted the characterization that it thought would be given to them by the State courts of Minnesota in the application of the property law of that State and drew analogies between the boats and certain objects like screens and storm windows attached to houses and which are considered to be fixtures even though readily removable from the houses. The Court laid considerable emphasis on the old Minnesota case of Wolford v. Baxter, 33 Minn. 12, 21 N.W. 744 (1844). (305 F.Supp. at 88-89.)
 
 
 28
 It is quite true that in a condemnation case a federal court will ordinarily look to State law to determine whether a given object is real property or whether it is personal property. United States ex rel. and for Use of T.V.A. v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L. Ed. 1390 (1943); California v. United States, 9 Cir., 395 F.2d 261 (1968); United States v. Certain Property, etc., 2 Cir., 344 F.2d 142 (1965); United States v. Becktold Co., 8 Cir., 129 F.2d 473. However, as indicated in Powelson, supra, 319 U.S. at 279, 63 S.Ct. 1047, the ultimate question of what is "property" within the just compensation clause of the Fifth Amendment is a federal question. And in Nebraska v. United States, 8 Cir., 164 F.2d 866, 868 (1947), this Court cautioned that a federal condemnation court does not necessarily accept "every local idiosyncracy or artificiality in a state's concepts, or the incidents thereof."
 
 
 29
 Upon consideration we have concluded that under any body of applicable law the Pete boats cannot rationally or properly be characterized as real estate and that the District Court erred in so characterizing them.
 
 
 30
 A self-propelled boat whether an ocean liner, a Great Lakes freighter, or a cabin barge like those of the Petes, designed to navigate large bodies of water transporting thereon crew, passengers, and cargo is an almost complete antithesis to a "fixture." While any vessel in order to be used effectively perhaps must have a land base or home port, it does not follow that the vessel is in any sense "attached to" the base or port or is a part of it within the law of real property. And we think it a strained and impermissible analogy to equate the Pete boats with the various objects mentioned in the opinion of the District Court. Nor do we think that the Pete boats are at all comparable to the dredge involved in Colorado Gold Dredging Co. v. Stearns-Roger Manufacturing Co., 60 Colo. 412, 153 P. 765 (1915), a case which the District Court thought was analogous to this one.
 
 
 31
 If Tract 3520 had been the only piece of property on Basswood Lake condemned by the Government and if the rest of the shoreline had been left in private ownership, no one would contend for a moment that the condemnation included the boats. The Petes would simply have shifted their base of operations to another place on the Lake taking their boats with them or would have sold their boats to some other operator or operators.
 
 
 32
 It is true that the governmental actions in question deprived the Petes of the alternatives just mentioned, but that deprivation did not operate to attach the boats to Tract 3520. It is also true that it is not economically feasible to remove the boats from the Lake, but that lack of feasibility results from the nature of the construction, the size and dimensions of the boats, not from any attachment of them to real estate.
 
 
 33
 As the Government points out, what the Petes have really lost is their land and the business that they conducted with the land as a base. The boats were part of the business. They were not parts of the land, and the Petes are not entitled to compensation for them in this action.
 
 II.
 
 34
 As heretofore noted, this Court in United States v. Birnbach, 8 Cir., 400 F.2d 378, had occasion to apply the teaching of United States v. Rands, supra, to a partial taking by the Government in connection with the Arkansas River Project for flood control and navigation. The taking affected the Birnbach lands that were on the river front, and the landowners claimed severance damages. In allowing such damages the District Court took into consideration the loss of riparian rights resulting from the taking. We held this to be error, saying (400 F. 2d at 382):
 
 
 35
 "Generally, when part of a landowner's unit is taken, he is entitled to severance damages; in other words, the value is determined or `just compensation' is measured by the difference between the fair and reasonable market value of the entire tract of land immediately before the taking and the fair and reasonable market value of the portion that remains after the taking. United States v. Miller, 1942, 317 U.S. 369, at 375-376, 63 S. Ct. 276, 87 L.Ed. 336; United States v. Grizzard, 1911, 219 U.S. 180, 183, 31 S.Ct. 162, 55 L.Ed. 165; United States v. Smith, 5 Cir., 1966, 355 F.2d 807, 809. When the taker is the government and the taking is for navigational purposes, however, one important distinction must be made so that the enhancement in value `flowing' from a riparian location may not be recognized when the riparian character of the land is destroyed. The government, because of its constitutional power to control navigation (the Commerce Clause), has always had the right to the entire flow of a navigable body of water. These factors may not be taken into consideration as against the government, and thus it appears that the court in this case applied an improper standard in determining severance damages. See, United States v. Rands, 1967, 389 U. S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329; United States v. Virginia Electric & Power Co., 1961, 365 U.S. 624, 629, 81 S.Ct. 784, 5 L.Ed.2d 838; United States v. Twin City Power Co., 1956, 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240; and United States v. Commodore Park, Inc., 1945, 324 U.S. 386, 390-391, 65 S.Ct. 803, 89 L.Ed. 1017."
 
 
 36
 The landowners argue here that the Government's dominant easement with respect to the navigable waters of this country is limited to situations in which the Government acts in aid of navigation or flood control, and that as far as environmental or ecological projects like the Boundary Waters Canoe Area are concerned no such easement exists. The landowners further contend that private riparian rights in the Superior National Forest and in the Canoe Area have been expressly recognized and preserved in pertinent legislation dealing with the Forest and the Area.[7] And it is still further argued that at least as far as total takings are concerned, the rule of Rands has been repealed by section 111 of the Rivers and Harbors and Flood Control Act of 1970, which was made applicable to pending condemnation suits. Act of December 31, 1970, P.L. 91-611, 84 Stat. 1818.
 
 
 37
 The Government denies that its easement with respect to navigable waters is limited as argued by the landowners, denies that the Petes had any riparian rights on Basswood Lake that were superior to the Government's easement, and denies that the statute just mentioned has anything to do with this case. As indicated, the position of the Government is that the District Court erred not in applying Rands to the real estate proper but in refusing to apply it to the improvements as well.
 
 
 38
 We accept the landowners' argument based on section 111 of the Rivers and Harbors and Flood Control Act of 1970 and, therefore, find it unnecessary to evaluate their other arguments. Section 111 of the Act is as follows:
 
 
 39
 "Sec. 111. In all cases where real property shall be taken by the United States for the public use in connection with any improvement of rivers, harbors, canals, or waterways of the United States, and in all condemnation proceedings by the United States to acquire lands or easements for such improvements, the compensation to be paid for real property taken by the United States above the normal high water mark of navigable waters of the United States shall be the fair market value of such real property based upon all uses to which such real property may reasonably be put, including its highest and best use, any of which uses may be dependent upon access to or utilization of such navigable waters. In cases of partial takings of real property, no depreciation in the value of any remaining real property shall be recognized and no compensation shall be paid for any damages to such remaining real property which result from loss of or reduction of access from such remaining real property to such navigable waters because of the taking of real property or the purposes for which such real property is taken. The compensation defined herein shall apply to all acquisitions of real property after the date of enactment of this Act, and to the determination of just compensation in any condemnation suit pending on the date of enactment hereof."
 
 
 40
 The Act had not been adopted when the case was tried below, but in view of its express terms it must be recognized here if it applies to condemnations of land in connection with the Boundary Waters Canoe Area Project.
 
 
 41
 As we construe section 111, it is not limited to the particular projects authorized in other sections of the Act but extends to all acquisitions of land by the Government after the effective date of the Act and, as has been seen, to the determination of just compensation in all condemnation suits pending on the date of enactment.
 
 
 42
 The government argues that the "improvements" of rivers, harbors, canals, and waterways referred to in section 111 are limited to "conventional" improvements such as the construction of locks and dams and projects for bank stabilization or for the stabilization or deepening of the channels of navigable streams. We disagree.
 
 
 43
 Regardless of the limitations to which the Government's powers with respect to navigable waters may be subject, it is clear that those powers are broad, and that the public interests which those powers are designed to serve are also broad.
 
 
 44
 Those interests are not limited to the promotion and fostering of trade and commerce along and upon our waterways or to the control or prevention of destructive floods. They include, in our estimation, those interests which are aesthetic, ecological, and environmental as well as those which are economic and commercial.
 
 
 45
 We think that the Congress and the Executive Branch of the Government may properly conclude that the encroachment of civilization and commercial enterprise upon a wilderness area and the navigable waters found therein militates against the broad public interests that have been mentioned, and that when the Government commands civilization and business to retreat from a given area so that it may be preserved in its natural state for the enjoyment and refreshment of all of us, it may fairly be said that the Government is acting to "improve" the area and the waterways therein. We so hold.
 
 
 46
 Since the taking involved in this case was a total taking, we think that section 111 of the Act is applicable and should be followed upon a retrial of the case.
 
 
 47
 That means that the Pete lands and the fixed improvements thereon are to be valued as riparian lands and that their access to the Lake is to be taken into consideration in fixing their value as of January 20, 1966.
 
 
 48
 However, in making that valuation the District Court must give due regard in instructing the jury to the restrictions to which use of the property and of the Lake were in fact subject at the time of the taking. Those restrictions, if any, should be given the same consideration as would have been given to them by reasonable men negotiating for the purchase and sale of Government Lot 6 as enhanced by the fixed and permanent improvements thereon but without regard to the boats.
 
 
 49
 We do not undertake to define those restrictions. The District Court should have no difficulty in doing that by reference to the regulations and statutes that have been mentioned.
 
 III.
 
 50
 The District Court dealt with the subject of rent in both its January and August, 1970, opinions. In the latter opinion the Court said:
 
 
 51
 "The government's motion for rent must be denied. The court stated in its order of January 6, 1970 concerning this issue:
 
 
 52
 "`The government has asked the court for an order deducting 7% per annum from the award for tract 3520Cc for rental value of the use of the Hoist Bay property since January 20, 1966, the commencement of the condemnation proceedings. The court heard no evidence on this matter, nor was any offered. The court has no idea of why, how or under what arrangement Petes have remained in possession to date except some vague hearsay knowledge that such has been by an arrangement with the United States Forestry Service. In any event, the court cannot grant such an order absent any evidence to form a basis therefor.'
 
 
 53
 "No further evidence was adduced on this issue at the second trial, nor was the subject then mentioned or argued. During 1970, the landowners have not been permitted to operate their resort business. At the argument on these motions the court inquired of the Assistant United States Attorney concerning the arrangement between the government and the landowners. He replied:
 
 
 54
 "`MR. ANDERSON: Well, yes, I know what the people from the Forestry Service tell me, and if you want me to tell you that, I can.
 
 
 55
 "`The Forestry Service tells me that, A, they wanted to cooperate with the Petes in connection with negotiating this thing out and they had hopes right up to the last minute that it wouldn't come to trial; and, B, they felt the boats were not compensable and they thought "He is not going to be compensated for these boats and we will let him use the site there and earn some money, which, in kind of approximate justice will compensate him for that."
 
 
 56
 "`Frankly, I don't think the reason is relevant. He did use the land.
 
 
 57
 "`THE COURT: And he did use the boats.
 
 
 58
 "`MR. ANDERSON: He did use the boats and we have earned rent; and that is the essence of the argument, and I think the only defense is a contract by somebody authorized by the government to enter into it that rent was waived.'
 
 
 59
 "The Attorney for the landowners quite properly, it would seem, urges that if the court were to consider passing on the question of rent, it ought to hear evidence on the arrangements between the government and the landowners and all of the surrounding circumstances, correspondence and stipulations and not merely deduct an arbitrary sum from the jury's condemnation award based on the bare fact that the landowners have remained in possession for some time after the date of taking in January 1966."
 
 
 60
 We fully agree with the District Court that an award of rent on the basis of the record before it and without the landowners having had an opportunity to make proof on the subject would have been improper. Were we affirming the District Court on the other issues in the case, that would be the end of the rent controversy. But since we are remanding the case, the controversy may arise again.
 
 
 61
 The Declaration of Taking Act, 40 U.S. C.A. § 258a, provides, among other things, that when a declaration of taking is filed, the court shall have the power to fix the time within which and the terms upon which the parties in possession of the property covered by the declaration shall be required to yield possession to the Government. And the court is given express power to "make such orders in respect of encumbrances, liens, rents, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable."
 
 
 62
 It is not unusual in cases of this kind for the condemnation court at the outset or at an early stage of the proceedings to make an order permitting the former owner of the property to remain in possession for a certain period of time and to prescribe the terms and conditions upon which he may remain in possession, which terms and conditions may include a requirement that the former owner pay rent, or maintain the premises, or keep them insured.
 
 
 63
 For example, a number of years ago Senior Circuit Judge Vogel while on the district bench permitted North Dakota farmers to remain in possession of their lands which had been condemned for dam and reservoir purposes during the 1948 crop year on condition that they pay reasonable and customary rentals for their lands. United States v. 6576.27 Acres of Land, More or Less in McLean County, N.D., D.C.N.D., 77 F.Supp. 244 (1948). More recently, Senior Judge Miller permitted a railroad company which had suffered a condemnation of part of its right of way to remain in possession after the taking at its own risk so long as its continued possession did not interfere with the prosecution of the Government's dam and reservoir project. United States v. 27.7 Acres of Land, More or Less, in Carroll County, Arkansas, W.D.Ark., 214 F.Supp. 707 (1963). Judge Miller said (p. 715 of 214 F.Supp.):
 
 
 64
 "Often in cases where large areas are condemned for reservoir purposes, the courts permit property owners to retain possession of the property until the rise of impounded waters makes it necessary that they vacate when such possession on the part of the property owner does not in anywise interfere with the construction of the dam."
 
 
 65
 Where, as here, the condemnation court does not deal specifically with possessory problems and where the former owner simply remains in possession of the land and continues to use it, controversies between him and the condemning agency can and do arise at late stages of the proceedings, as happened in this case. Such controversies are dealt with rather extensively in an annotation appearing in 20 A.L.R.3d 1164 et seq. following the text of the opinion in State of Minnesota by Mondale, Attorney General v. Bohnen, 273 Minn. 266, 140 N.W.2d 838, 20 A.L.R.3d 1157 (1966).
 
 
 66
 In that case the State of Minnesota had condemned an office building in Ramsey County for use in connection with a trunk highway project; the owner of the building remained in possession for eleven months after the taking. The State was required to pay interest on the ultimate award of just compensation to the owner and moved to offset against the total amount due the landowner the reasonable rental value of the property for the period during which the former owner continued in possession. The trial judge granted the offset finding in that connection that a reasonable rent for the building during the period in question was $2,500 per month. There was an appeal by the former owner.
 
 
 67
 The Minnesota Supreme Court held that the State was entitled to an offset for rent, but that the offset should be limited to the interest that the State was required to pay on the award. The Court also stated that the reasonable rental value of real estate is or tends to be less after condemnation than it was before condemnation, and that a proper determination of post-condemnation rent in an ordinary case requires "a separate assessment of it by witnesses who have taken into account the effect of the condemnation. The trier of fact should have the benefit of this evidence before a determination is made." (20 A.L.R. 3d at 1161).
 
 
 68
 The rationale of Bohnen is that the condemnor's entitlement to an offset for rent arises from the fact that it is required to pay interest on all or part of the award, and it would be unjust to allow the landowner to receive the full value of his property plus interest without requiring him to discharge some liability for rent on account of his post-taking possession. And the same reasoning dictated the Court's conclusion that the amount of the offset should be limited to the amount of interest that the condemnor is required to pay. (20 A.L.R.2d at 1161-1162.)
 
 
 69
 An examination of the annotation that has been mentioned indicates that there is a very sharp division among the authorities which have dealt with the problem. Some courts do not allow an offset for rent. Some allow it but limit it to the amount of interest on the award. Still others allow it against the award itself. The cases cited by the Government fall within the third category just mentioned. Certain Land in City of Washington, D. C. v. United States, 122 U.S.App.D.C. 400, 355 F.2d 825 (1965); United States v. Certain Interests in Property in Borough of Brooklyn, 2 Cir., 326 F.2d 109 (1964) in which the Court described its earlier holding as being to the effect that "the United States was entitled to the rental value of the premises from the date of taking, when title vested in the government, to the date when the government was awarded possession." 326 F.2d at 112, f. n. 1.
 
 
 70
 This Court seems to have had no occasion to consider the question, and with the instant case in its present status we deem it undesirable to commit ourselves at this time to any of the three rules that have been applied in other Circuits and in the State courts. If in the course of the remand which is to be ordered the Government desires to renew its demand for rent it should do so promptly; the matter should be adequately developed, and appropriate findings should be made. If either side is dissatisfied with the District Court's ultimate ruling on the question of rent, the question can be brought to this Court again.
 
 IV.
 
 71
 At the close of the evidence in the second trial counsel for the Government tendered 33 requests for instructions, and the landowners tendered five requests. The instructions actually given by the Court cover 27 pages of the Appendix before this Court.
 
 
 72
 The Government contends that the District Court erred in refusing certain of its requests. One or more of those requests dealing with depreciation on the boats have become moot since we are taking the boats out of the case. At to the others, it appears to us that to the extent that they stated the law correctly their subject matter was covered adequately by the comprehensive charge that the Court in fact gave to the jury.
 
 
 73
 Reversed and remanded.
 
 
 
 Notes:
 
 
 *
 Chief Judge, Eastern District of Arkansas, sitting by designation
 
 
 [1]
 The Superior National Forest was created originally by a 1909 Proclamation of President Theodore Roosevelt, 35 Stat. 2223. It was expanded by the Shipstead-Nolan Act of 1930, 16 U.S.C.A., §§ 577, 577a, and 577b, and was dealt with further in the Thye-Blatnik Act of 1948, 16 U.S.C.A., §§ 577c and 577d. The National Wilderness System was established by the Act of September 3, 1964, 78 Stat. 890, 16 U.S.C.A. § 1133, which Act refers specifically to the Boundary Waters Canoe Area. Section 5(c) of that Act authorizes the acquisition of privately owned wilderness lands by the exercise of the Government's power of eminent domain if the owner concurs in the acquisition or if the acquisition is specifically authorized by Congress. No question is here raised as to the propriety of the taking. The Government proceeded under the Declaration of Taking Act, 40 U.S.C.A., § 258a, and made a deposit of money in the registry of the District Court as estimated just compensation
 
 
 [2]
 The League settled its claim for just compensation and it is not involved in this appeal. There has never been any controversy between the League and the Petes
 
 
 [3]
 As will be seen presently, the question of whether the Petes are entitled to be paid for the barges in this proceeding is most interesting. It should be mentioned that there were originally six barges belonging to the Petes. Prior to the taking three of those barges had been removed permanently from the water and had been converted into living quarters on Lot 6. It is conceded that those three barges constituted compensable improvements to the property
 
 
 [4]
 In United States v. Birnbach, 8 Cir., 400 F.2d 378 (1968), we appliedRands to a partial taking which deprived the owner of that portion of his lands which was riparian to the Arkansas River in Pulaski County, Arkansas.
 
 
 [5]
 The Petes' operation of the boats was seasonal. It appears from the record that they operated during the 1966, 1967, 1968, and 1969 seasons after which they yielded possession to the Government and presumably abandoned the boats, the present status of which is not clear
 
 
 [6]
 We note in passing that between the first trial and the second trial this Court declined to entertain an interlocutory appeal although the District Court certified that the case was a proper one for such an appeal. 28 U.S.C.A., § 1292(b)
 
 
 [7]
 See footnote 1, supra