PETER WOLFORD *vs.* GEORGE N. BAXTER and others.

December 18, 1884.

**Mortgage—Fixtures.**—Certain casks or hogsheads and fermenting-tubs, and a copper cooler, used in a brewery, *held*, on the agreed statement of facts in this case, to be personal property, and not fixtures, and not covered by a mortgage upon the land.

Plaintiff, who is the owner and holder of a mortgage upon certain land in Faribault, on which is situated a brewery, brought this action in the district court for Rice county to restrain the defendants from interfering with, and impairing his security by removing and selling, certain articles which plaintiff claims are fixtures of the brewery, and in particular to restrain defendant Baxter from attempting to sell these articles under a chattel mortgage. The answer of defendant Baxter denies that the articles specified are fixtures, and claims them under a chattel mortgage.

The action was tried before *Buckham*, J., without a jury, upon an agreed statement of facts as to the particular property in controversy, and its character, use and location, which was in substance as follows :

The articles in dispute are "one circular rotary pump, (iron and now in vault;) one air-pump now attached by bolts to a timber in the vaults; one iron pump attached to floor over well in vault; forty-seven (being all) of the large coops, casks or hogsheads used for holding and storing beer; twelve (being all) of the fermenting-tubs, on said premises; one copper cooler; six (being all) of the swimmers for holding ice for cooling beer; ice-tools, pitching-machine and kettle."

The circular rotary iron pump "is not physically annexed to the realty by nails, bolts or screws, but is detached and easily removable from place to place." It is used in different parts of the brewery for transferring beer from the fermenting-tubs to the coops or hogsheads by means of a hose. It is a piece of movable machinery and very useful in the business, though not indispensable.

The air-pump is "used in forcing air into the coops or hogsheads." When used it "is generally attached by bolts or screws to some part

of the building, and, as occasion required, the same was usually removed from place to place in the brewery for use." It is a great convenience in the business.

The iron pump "is permanently and physically annexed to the freehold."

"The swimmers are appliances used for cooling beer in process of manufacture." When in use they are filled with ice and floated in the cooling tanks; otherwise they are stored on the premises.

The pitching-machine is a piece of movable machinery and is used in heating pitch to pitch hogsheads and beer-kegs.

The ice-tools are useful in handling ice, which is necessary to be used in the manufacture of beer.

The swimmers, pitching-machine and ice-tools are not physically annexed to the freehold.

The copper cooler is an appliance composed of copper pipes which is used in brewing beer in the summer only for the purpose of cooling the beer after it is brewed. When in use it is not attached to the building, excepting by a rubber hose to a water tank, (which is admitted to be a fixture.) When not in use, the rubber hose is unscrewed and detached, and the cooler is stored in the brewery until needed for use again the next season. This cooler is a modern appliance or invention, useful in the process of the manufacture of beer, and was purchased by the owners of the brewery and placed therein prior to the execution of plaintiff's mortgage, and has ever since been used therein in the summer season when needed.

"The brewery building was built by the owners of the premises before plaintiff's mortgage was executed, for the purpose of, and was especially adapted to the purpose and business of, brewing beer and other malt liquors. In connection with said brewery building, and for use in connection therewith, the owners excavated in the bluff in the rear of and under the brewery building, certain vaults or cellars, in the sand rock under and adjacent to the building, all within the premises, about 300 feet in length, and from 10 to 15 feet wide, and about 12 feet high, which vaults or cellars were intended, and have always been used, for the purpose of storing beer, and containing most of the said coops and hogsheads and some of the fermenting-

tubs, which are all or a part of them usually filled with beer made at said brewery, and in which vaults the beer is drawn from said casks or coops into the beer kegs in which it is sold in the course of the business of said brewery.

"The coops or casks were constructed for the owners of said brewery, and are and have been used for the purpose of storing beer made at said brewery. After the beer has been brewed, cooled and fermented, in order to prepare it for sale it is necessary that it should be stored in coops or hogsheads for some weeks at least, in said vaults, or in the patent ice-house, where an even temperature can be had. Such vaults and ice-house are necessary to the carrying on of the business of brewing and manufacturing of beer and fitting and preparing it for the market. The patent ice-house was constructed for the special purpose of placing therein fermenting-tubs in the second story, and coops and casks in the first story thereof, so as to keep the beer in the fermenting-tubs and casks at a cool, even temperature during the fermenting of the beer and the curing thereof, so as to fit it for sale in the market.

"The coops or hogsheads were constructed and intended for use in said brewery in the manner and for the purpose above mentioned, and such coops or hogsheads are essential and necessary for said purpose; they are not physically attached to the freehold, except by their own weight, which is about 500 pounds each, when empty, and they rest upon a platform of timber in said vaults and ice-house, and by their own weight only, and by no other means of attachment. They have a capacity of from twelve to twenty barrels each, and are about five feet long by five feet in diameter. They are usually, at least once, and generally oftener, in each year, removed from their usual places to the outside of the brewery building, upon the premises covered by said mortgage of plaintiff, and there pitched with resin, etc., for the purpose of making them tight, so that they will not leak; and when it is necessary to repair them, which occasionally happens, they are taken off the premises to some cooper shop for repairs, and after they are repaired and pitched as aforesaid, they are brought back into said vault and ice-house, and used for storing said beer, as above mentioned.

"The fermenting-tubs were constructed for the purpose of use in such brewery, and they were, before the execution of said mortgage, placed in said brewery for the purpose of being used therein in the manufacture of beer, for which purpose it is necessary and essential to have such tubs in which to allow the beer, after it has been brewed, to ferment before it is drawn off into the above-mentioned coops or hogsheads.

"None of said fermenting-tubs are physically annexed or fastened to the freehold except by their own weight, which is about five hundred pounds each, when empty, and they rest by their own weight, and that of the beer in them, upon the floor of the brewery or its rooms or cellars. They have about the capacity of twenty barrels each, and are about five feet high and five feet in diameter. They are frequently removed from the brewery when it is necessary to repair them, and are then repaired and then returned.

"It is conceded that said coops or hogsheads and copper cooler and fermenting-tubs, if removed from said brewery, might be of some value for other purposes than that for which they were constructed or adapted, and that they might be sold to other brewers for purposes for which they were constructed.

"That said coops or hogsheads and fermenting-tubs were placed in said brewery with the intent that they should remain there for permanent use in said brewery for the purposes above set forth.

"That fermenting-tubs and hogsheads or coops, of the same description as those in controversy, are in general use in breweries and for the same purposes as those in controversy."

Upon the above stipulated facts, the court held that the air-pump and iron pump were fixtures and covered by plaintiff's mortgage, and that the rotary pump, coops, fermenting-tubs, cooler, ice-swimmers, ice-tools, pitching machine and kettle were personal property, and not covered by plaintiff's mortgage. Judgment was ordered accordingly, and plaintiff appeals from an order refusing a new trial.

*F. Hooker,* for appellant, cited Ewell on Fixtures, 20–22, 34, 293; *Rufford* v. *Bishop,* 5 Russ. 346; *Walmesly* v. *Milne,* 7 C. B. (N. S.) 115; 17 Am. Dec. 691, notes; *Stockwell* v. *Campbell,* 39 Conn. 362; *Wood* v. *Whelen,* 93 Ill. 153; *Chapman* v. *Union M. Life Ins. Co.,* 4

Ill. App. 29; *Ottumwa Woolen M. Co.* v. *Hawley*, 44 Iowa, 57; *Eaves* v. *Estes*, 10 Kansas, 314; *Farrar* v. *Stackpole*, 6 Me. 154; *Trull* v. *Fuller*, 28 Me. 545; *Parsons* v. *Copeland*, 38 Me. 537; *Symonds* v. *Harris*, 51 Me. 14; *Strickland* v. *Parker*, 54 Me. 263; *McRea* v. *Cent. Nat. Bank*, 50 How. Pr. 51; *Bishop* v. *Bishop*, 11 N. Y. 123; *Deal* v. *Palmer*, 72 N. C. 582; *Christian* v. *Dripps*, 28 Pa. St. 271; *Hill* v. *Sewald*, 53 Pa. St. 271; *Meigs' Appeal*, 62 Pa. St. 28; *Seeger* v. *Pettit*, 77 Pa. St. 437; *Ege* v. *Kille*, 84 Pa. St. 333; *Morris' Appeal*, 88 Pa. St. 368.

*Geo. N. Baxter*, respondent, *pro se*, cited Ewell on Fixtures, 13, 17, 23, 24, 292; Hill on Fixtures, 25; *Teaff* v. *Hewitt*, 1 Ohio St. 511, 540; *Voorhees* v. *McGinnis*, 48 N. Y. 278; *McRea* v. *Cent. Nat. Bank*, 66 N. Y. 489; *Walker* v. *Sherman*, 20 Wend. 636; *Quinby* v. *Manhattan Co.*, 24 N. J. Eq. 260; *Vanderpoel* v. *Van Allen*, 10 Barb. 157; *Capen* v. *Peckham*, 35 Conn. 88; *Pierce* v. *George*, 108 Mass. 78; *Blancke* v. *Rogers*, 26 N. J. Eq. 564; *Keve* v. *Paxton*, 26 N. J. Eq. 107; *Ferris* v. *Quimby*, 41 Mich. 202.

MITCHELL, J. In February, 1881, the defendants Mueller and Siebold, being the owners of certain real estate upon which was situated a brewery, executed a mortgage on the premises to the plaintiff. In February, 1883, the same parties executed a chattel mortgage on the articles in controversy to defendant Baxter. The plaintiff claims that these articles were fixtures constituting a part of the realty, and as such were covered by his mortgage on the land. On the other hand, defendant Baxter claims that they were chattels. This presents the only point in the case. The court below held that the air-pump and the iron pump, which were fastened to the building, were a part of the realty and covered by plaintiff's mortgage. Hence, as Baxter does not object, these articles need not be considered. It is too plain to require argument that the loose circular rotary pump, the swimmers, ice-tools, pitching-machine, and kettle were mere chattels. In fact, plaintiff makes no point as to them. This reduces the controversy to three classes of articles, to wit, 47 large coops, casks, or hogsheads used for holding and storing beer, 12 fermenting-tubs, and 1 copper cooler. In fact, they may be reduced to two classes, for the coops and fermenting-tubs stand on the same footing. The case was

submitted in the court below upon an agreed statement of facts, which we will leave to be set out, so far as material, in the statement of the case.

It has often been remarked that the law of "fixtures" is one of the most uncertain titles in the entire body of jurisprudence. The lines between personal property and fixtures is often so close and so nicely drawn that no precise and fixed rule can be laid down to control all cases. It is difficult, if not impossible, to give a definition of the term which may be regarded of universal application. Each case must be more or less dependent upon its own peculiar facts. Whether a thing is a fixture or not has been sometimes said to be a question partly of law and partly of fact. Almost every court and every text-writer has attempted to define the term. None of these definitions are infallible or of universal application; but they are of service in determining whether an article is or is not, in a given case, a fixture. These definitions may be found collected in almost any law dictionary or text-book on the subject. We shall neither quote them nor attempt to give a definition of our own, but simply say that they all agree that "fixtures," in the primary meaning of the term, (and distinguished from movable or tenants' fixtures,) means chattels annexed to the realty so as to become a part of it.

While not agreeing as to the necessity for, or the degree of importance to be attached to, the fact of actual physical annexation, yet the authorities generally unite in holding that, to constitute a fixture, the thing must be of an accessory character, and must be in some way in actual or constructive union with the principal subject, and not merely brought upon it; that in determining whether the article is personal property, or has become a part of the realty, there should be considered the fact and character of annexation, the nature of the thing annexed, the adaptability of the thing to the use of the land, the intent of the party in making the annexation, the end sought by annexation, and the relation of the party making it to the freehold. These other tests named, while having an important bearing upon the questions whether there has been an annexation, and, if so, its effect, do not, however, do away with the necessity of annexation, either actual or constructive, to constitute a fixture. This would in-

volve a contradiction of terms, and wipe out the fundamental distinction between real and personal property. A thing may be said to be constructively attached where it has been annexed, but is separated for a temporary purpose, as in the case of a millstone removed for the purpose of being dressed, or where the thing, although never physically fixed, is an essential part of something which is fixed; as in the case of keys to a door, or the loose cover of a kettle set in brick-work. It is, perhaps, somewhat on this principle that the permanent and stationary machinery in a structure erected especially for a particular kind of manufacturing has been held fixtures, although very slightly or not all physically connected with the building; because, without it, the structure would not be complete for the purpose for which it was erected. Ponderous articles, although only annexed to the land by the force of gravitation, if placed there with the manifest intent that they shall permanently remain, may be fixtures.

But, while physical annexation is not indispensable, the adjudicated cases are almost universally opposed to the idea of mere loose machinery or utensils, even where it is the main agent or principal thing in prosecuting the business to which the realty is adapted, being considered a part of the freehold for any purpose. To make it a fixture, it must not merely be essential to the business of the structure, but it must be attached to it in some way, or, at least, it must be mechanically fitted so as, in ordinary understanding, to constitute a part of the structure itself. It must be permanently attached to, or the component part of, some erection, structure, or machine which is attached to the freehold, and without which the erection, structure, or machine would be imperfect or incomplete.

On applying these rules and tests to the case in hand, we are of opinion that the coops or casks and tubs in controversy have none of the characteristics of fixtures. They were not actually annexed to the freehold, nor were they of a nature to be deemed constructively affixed to the realty. It is true that they were well adapted to and necessary for carrying on the brewing business, to which the premises were appropriated; but this of itself is quite an immaterial element in determining the nature of an article. Many articles of a purely personal

nature are useful and necessary in carrying on a particular business which can in no just sense be termed fixtures. These articles were no more essential to the brewing business than were the ice-tools, pitching-machine, or ordinary beer-kegs, or are farm machinery for the business of husbandry. It is also true that it is stipulated that these casks and tubs were constructed for the purpose of being put into and used in this brewery, and were placed there with intent that they should remain there for permanent use, and that the vaults were excavated for the special purpose of storing therein *such* hogsheads, and that the ice-house was constructed for the special purpose of placing therein fermenting-tubs in the first story, and casks in the second; but it does not appear that the vaults were excavated or the ice-house built in any special shape to suit these particular casks or tubs, or that the casks or tubs were constructed to fit into any particular place in the vaults or ice-house. They were adapted to receive any other casks or tubs as well as these, and any other such casks or tubs would have been just as well adapted to be stored there as these. It is expressly stipulated that these tubs and hogsheads were of the same description as those in general use in breweries, and that they might be sold to other brewers for the purposes for which they were constructed. They were readily removed from the vaults and ice-house, and in fact were removed once a year or oftener outside, for the purpose of being pitched or repaired. We can see no particular difference between them and ordinary beer-kegs, except that they were used exclusively inside of the vaults or ice-house, and, being larger, were somewhat more difficult to move. The intent that they should remain in this brewery for permanent use there is unimportant. Intent alone will not convert a chattel into a fixture. A farmer may take a plow, or any other farm implement, upon his farm with intent to keep and use it there until it wears out, but this will not make it real estate. Moreover, it will be noted that it is not stipulated that these articles were placed in the brewery with intent to make them a permanent accession to the freehold, but merely that they should remain there for permanent use.

What has been said as to the hogsheads and tubs will in the main apply to the copper cooler. It was a loose, movable utensil, the same

as in common use in breweries. The only ground for a distinction between this and the other articles is that, when in use, it was connected by a hose to a stationary water-tank, in order to permit water to pass through it. When not in use the hose was disconnected, and the cooler was laid away. The object and purpose of this temporary annexation was not to make the cooler a permanent accessory to the building, but for the purpose of using the article as a chattel. It may be, on the facts, a little closer case than that of the hogsheads and tubs, but the court below having found it to be personal property. we see no occasion to disturb his decision.

Order affirmed.