UNITED STATES of America,
Plaintiff,

v.

967.905 ACRES OF LAND, MORE OR
LESS, Situate IN COOK ET AL. COUN-
TIES, STATE OF MINNESOTA, et al.
Claim of Jacob PETE and James Pete,
Landowners as to tracts
3520Cc and 4098.

No. 5–66 Civ. 6.

United States District Court
D. Minnesota,
Fifth Division.

Sept. 11, 1969.

Robins, Davis & Lyons, by Solly Robins and Steven H. Goldberg, St. Paul, Minn., for defendants.

Ralph E. Koenig, Asst. U. S. Atty., Minneapolis, Minn., and Carl Strass, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

NEVILLE, District Judge.

This eminent domain proceeding, commenced January 20, 1966 presents a fact

situation characterized by the land-owners' counsel as unique if not in fact sui generis. Such seems to be true, at least to the extent that neither counsel have been able to furnish the court with any prior decisions or authorities involving similar facts. The issue, simply stated, is whether certain property is included in the "taking" effected by the Federal government's condemnation action.

The United States, in cooperation with the Dominion of Canada, established a wilderness area under the authority found in the Wilderness Act passed by Congress in 1964, 16 U.S.C. § 1131 et seq. The area lies along the international boundary between the United States and Canada and is partly in northern Minnesota. This has been named The Boundary Waters Canoe Area and encompasses some four million acres. It includes numerous sizeable lakes and chains of lakes, linked to each other in many instances by rapids, rivers or creeks. The area is dedicated to perpetual wilderness and no commercial activities may be carried on within its boundaries. With minor exceptions, private permanent structures are prohibited, no mechanical portages are permitted, and no resorts or public hostelries may exist. None but handpowered boats are allowed except on certain restricted routes. The area is designed to remain substantially roadless, and entering the area by airplane is banned. It is one of the last remaining areas of its kind in North America and attracts Boy Scouts, campers, sportsmen, Izak Walton League members and others from the entire United States and Canada, usually for several-day to several-week canoe trips, fishing outings, etc.

Consonant with this objective, the United States condemned all the privately owned property in The Boundary Waters Canoe Area, including two separate tracts, one owned by Jacob Pete alone, and in the other of which Jacob Pete and his son James Pete own undivided interests with persons who are not parties here.

Some 35 years ago, more or less, Jacob Pete acquired a one-fourth interest in real property known in this proceeding as the Hoist Bay Property on Basswood Lake, comprising approximately 12 acres of fast land, of which four acres are on high ground with the remaining eight acres presently devoted to wild rice beds. He acquired also a 40 acre tract not on the lakeshore but on a portage to the Hoist Bay property, which tract the government has included with the Hoist Bay property as part of parcel #3520Cc in the condemnation proceedings.[1]

Over the years Jacob Pete, who later conveyed a partial interest to his son James, erected on the Hoist Bay property a main cabin 18 by 24 feet with an annex, a storage building or tool shed, a lumber shed, an ice house, a gasoline house, a service dock, a boat landing area, other miscellaneous improvements, and a device with heavy steel rails analogous to a railroad track running from shore into the lake used in conjunction with a motor or tugger to pull heavy boats out of the water. He conceived the idea of building what he has called cabin barges or cabin boats. These are rather large and ponderous with a two-story or two-deck superstructure which can sleep 12 people or more in bunks. The first deck includes an open area for eating and recreation, and provides space for a kitchen and equipment for the boat. At the time of the institution of the condemnation proceedings the Petes had three such boats in service on Basswood Lake. Two others had previously been hauled up on shore and rough foundations built under them. They were used as cabins. Another such boat was situate on the steel rails, apparently having been hauled up for repairs but which were never made following the

---

1. There is some variance between this loose description and the exact legal description specified in the condemnation proceedings, but such is not material for the present purpose.

institution of these condemnation proceedings. Though the Petes owned but a one-fourth interest in the realty, it is admitted that they had the entire ownership of the improvements thereon.

Petes' customers motor or fly to Ely, Minnesota and from thence drive a short distance to Winton, Minnesota where on a dock owned by the Petes they board a launch and are transported several miles across Fall Lake to a dock which is on one end of what is known as the four-mile portage. The four-mile portage is over land, including the 40 acre tract in which Petes have an undivided interest, and is accomplished by vehicular transportation presently in the form of an old school bus on a revitalized logging road to Basswood Lake and thus to the Petes' Hoist Bay place. A customer may, after the portage, board one of the cabin barges. These are motorized and are taken out into Basswood Lake for a period usually of several days. Two or more smaller rowboats which are used for fishing excursions generally are trailed behind the cabin barges. The Petes furnish a cook and the supplies for the boats. The 12 acre piece is referred to by the government as a base for this operation.

The cabin barges in service are steel-hulled and are estimated by witnesses to weigh between 25 and 40 tons. The government does not gainsay that the former boats which prior to the condemnation date had been brought up and put on foundations on the land, and thereafter used by fishermen and tourists as cabins are included in the "taking." The government's principal contention is that the three boats which are in service and afloat on Basswood Lake are personal property and not fixtures, and therefore are not included within the "taking" and so should not be considered in the awarding of just compensation.

From the evidence, the court is convinced that it is not possible to float the three boats out of, nor feasibly to remove them by any other means from, Basswood Lake short of nearly complete dismantling. The water inlets to, and the outlet from, Basswood Lake involve rapids and a difference in elevation of some 20 to 30 feet. Canoeists portage on land around these. The overland four-mile portage from Fall Lake is a narrow, rough road originally a logging road which at the request of the Government was viewed by the court, counsel and all jurors who traversed it to the Hoist Bay property. It is heavily lined with trees, many of them second growth. It has a wooden bridge in at least one place and on the particular branch road to Jacob Pete's property it has been cut through rocks which are close on both sides. A continuation of the portage road before the Pete branch off is not quite as narrow as the branch but does not differ materially from the remainder of the portage road. The testimony is, and such was observed by the court on the viewing, that to transport the boats out, even in wintertime so they could be brought over hard ground and then across the ice on Fall Lake to Winton would involve the cutting of perhaps hundreds of trees on the four-mile portage, would require the rebuilding or reinforcement of the wooden bridge and perhaps even the blasting of some rock. Further, the road passes through some low marshy spots and the testimony is that such ponderous objects would become mired, though wintertime frozen ground might obviate this if the snow would permit of movement. The court is convinced from his own observation that moving the boats out is a practical impossibility.

The testimony is that the boats were built on the premises; that the first steel hull was fabricated off the premises at a boatworks, but such difficulty was incurred in attempting to transport the hull to Hoist Bay that it had to be cut with a steel torch in part in order to reduce its size and then it was necessary to reweld it on the premises. The court believes that with the difficulty incurred just with the hull, the boats with their present superstructure would present an insoluble moving problem. The other boats were built by having the steel

plates brought to the premises and fabricated there by steelworkers. The superstructure was then built as to all boats by carpenters, plumbers, electricians, etc. at Hoist Bay. The boats are licensed and approved by the United States Coast Guard as seaworthy and the Petes operate under a hotel and motel license from the State of Minnesota.

There was uncontradicted testimony by a mover of heavy machinery and equipment as to the practical impossibility of moving the boats across the four-mile portage and uncontroverted evidence given by two boat manufacturers that to dismantle the boats and transport them broken down, even assuming the hulls could by proper blow-torch cutting be moved out, would completely destroy their value and the cost to rebuild them somewhere else would be as much as to start anew.

Counsel for the landowner points out that the boats are peculiarly adapted solely to Petes' operation and have no value otherwise. He attempts to make some point of the fact that on the actual date the government filed its condemnation proceeding, i.e., January 20, 1966, it was in the dead of winter and two of the boats had been hauled up out of the water and were thus on the land, annexed by gravity and the third was in a slip which the landowner had entrenched into his own premises and was frozen in the ice. He claims that the boats are analogous to fixtures and therefore should be included within the government's "taking."

The government stoutly resists this contention. It admits it should pay for the land and the improvements thereon, including the two former boats now on foundations and used as cabins. Under the case of United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967), and other authorities the government contends that the jury should not be permitted to place a value on the land as a port site. It further argues most strenuously that under any traditional legal definition these boats which are moveable cannot be said to be fixtures. The government does not seriously contend that they could be transported to any other lake nor does it dispute the fact that if dismantled and rebuilt the cost would be the equivalent of a new boat. The government attempts to argue that the landowner can still use the boats after the condemnation; that he will have the same rights as anyone to come into the area with canoe or non-motorized boat and if he can find a place to land the big boats he will be able to board them.[2] It is clear he will not be able to carry on a commercial operation or rent them out nor charge people for their use and from this the government argues that in reality by claiming a value for these boats the landowner is claiming a business loss which the government does not condemn nor take.

Government counsel at one time argued that conceivably the landowners might have or might have had if the Statute of Limitations has not run, some action in the Court of Claims under the Tucker Act, 28 U.S.C. § 1491, for an incidental or indirect taking, but continued to hold to the view that the boats are not "taken" in this particular proceedings. This will be discussed hereinafter.

■ The Fifth Amendment to the United States Constitution requires payment of just compensation when the United States Government takes private property for a public use. It long has been established that if machinery, fixtures, and equipment form a part of the realty and tend to enhance its value, such are included within the taking when the underlying fee interest is condemned

2. This contention seems questionable in view of Regulations of the Secretary of Agriculture (Defendants' Exhibit 15) which provide in part:
 "No amphibious craft of any type and no watercraft designed for or used as floating living quarters shall be moored to, used on, or transported over national forest land."

by the United States. United States v. Becktold Realty Co., 129 F.2d 473 (8th Cir. 1942). In the *Becktold* case the government had condemned certain land in Missouri on which was situate a bookbinding plant. It was the contention of the government that it was liable to compensate the owner only for the value of the land and building, but not for the plant machinery utilized in the building. The lower court found that the owner was entitled to compensation for the machinery. On appeal, the Court of Appeals affirmed the award and set forth the controlling test of compensability:

"If the machinery, fixtures, and equipment in this building *formed a part of the realty* and *tended to enhance the value of the realty,* then it was being taken by the Government the same as the building on the lot described was being taken." [Emphasis added]

Applying this principle to the instant case, there is no doubt that the cabin barges *enhanced the value of the realty* when considered as a part thereof. The jury found that the realty valued with the boats as a part thereof was worth $149,000. Without the boats as a part of the realty, the jury valued the owners' compensation at $64,000.

■ As to the further question of whether the machinery and fixtures *constituted a part of the realty,* the court in *Becktold* indicated that the issue must be resolved by reference to the law of Missouri, the state in which the condemned land was situate. A federal court normally will apply state concepts of real property law in determining what comes within a federal taking. United States v. Powelson, 319 U.S. 266, 279, 63 S.Ct. 1047, 1054, 87 L.Ed. 1390 (1943); United States v. Certain Property, etc., 344 F.2d 142 (2d Cir. 1965); State of California v. United States, 395 F.2d 261, 264 (9th Cir. 1968). Whether or not the cabin barges constituted a part of the realty and thus are within the taking is dependent as both parties seem to agree upon the law of the State

of Minnesota, the place in which the condemned land is situate.

■ Under Minnesota law personal property will be considered part of the realty if it can be termed a fixture. Wolford v. Baxter, 33 Minn. 12, 21 N.W. 744 (1844), is the basis of a long line of cases establishing the Minnesota law of fixtures. In *Wolford,* the court indicated that there is no precise or fixed rule for determining what constitutes a fixture and that each case must be decided on its own particular facts. Certain helpful but non-conclusive tests have been developed.

Particularly apposite in this case is the language in *Wolford* as follows:

"While not agreeing as to the necessity for, or the degree of importance to be attached to, the fact of actual physical annexation, yet the authorities generally unite in holding that, to constitute a fixture, the thing must be of an accessory character, and must be in some way in actual or *constructive* union with the principal subject [land], and not merely brought upon it; that in determining whether the article is personal property, or has become a part of the realty, there should be considered the fact and character of annexation, the nature of the thing annexed, the adaptability of the thing to the use of the land, the intent of the party in making the annexation, the end sought by the annexation, and the relation of the party making it to the freehold. * *

A thing may be said to be constructively attached where it has been annexed, but is separated for a temporary purpose, as in the case of a millstone removed for the purpose of being dressed, or where the thing, although never physically fixed, is an essential part of something which is fixed; *as in the case of keys to a door, or the loose cover of a kettle set in brick-work.* It is, perhaps, somewhat on this principle that the permanent and stationary machinery in a structure erected

especially for a particular kind of manufacturing has been held fixtures, although very slightly or not all physically connected with the building; because, without it, the structure would not be complete for the purpose for which it was erected. * * *" [Emphasis added] 33 Minn. at 17–18, 21 N.W. at 745.

Applying these rules and tests to the facts in the present controversy, the cabin barges must properly be characterized as fixtures. Although the boats were not physically annexed to the condemned realty except occasionally by mooring lines, they were of the nature to be deemed constructively annexed to the land. Similarly, screens and storm windows on a house, though readily removable and half of which are detached at any one time are fixtures having no value apart from the house itself and being capable only of an integrated use with the house.

■ Under *Wolford* the doctrine of constructive annexation has two essential requisites. First, that the chattel must be essential to the landowner's use of the real property. The cabin barges here are the very essence of that use. The Petes are engaged in providing mobile accommodations and fishing facilities on Basswood Lake with the floating cabin barges.

The second requirement of a constructive annexation is that the chattel:

"* * * must be attached to it [the realty] in some way, or, at least, it must be mechanically fitted so as, in ordinary understanding, to constitute a part of the structure itself. It must be permanently attached to, or the *component part* of, some erection, structure, or machine which is attached to the freehold, and *without which the erection, structure, or machine would be imperfect or incomplete*." [Emphasis added] 33 Minn. at 18, 21 N.W. at 745.

■ The cabin barges are not permanently and physically attached to the land, but they have a unity of use with the land, the docks, the spur track, the equipment in the sheds, and the sheds themselves, all of which the government admits are compensable fixtures. The boats, the land, and the structures on the land are inextricably bound together both in terms of physical proximity and commercial purpose. The boats were constructed on the land. It was the clear intention of the Petes that the boats should remain in Basswood Lake as accessories for permanent use in connection with the land. Lack of removability is a pertinent factual consideration in determining whether a chattel is a fixture. See Behrens v. Kruse, 121 Minn. 90, 140 N.W. 339 (1913). An analogous case here is Colorado Gold Dredging Co. v. Stearns-Roger Mfg. Co., 60 Colo. 412, 153 P. 765 (1915). There the court found constructive annexation of a dredge and declared it a fixture, stating:

"It was floated in an artificial pond from one side or end of which it took sand, gravel and rocks which, after being washed, were deposited at the rear of the dredge which moved forward as the work progressed. Had the dredge been actually fixed to the land and immovable the use for which it was intended would not have been possible. That such structure was intended for the permanent working of the deposit and not for mere temporary use cannot be doubted. It was an improvement 'of and upon' the gold bearing deposit essential to working it and as much a part of it as a mill on a load claim."

■ Considering the fact of constructive annexation, the unity of use with the land, the nature and accessorial character of the cabin barges, and all other relevant facts and circumstances, it is the opinion of this court that the floating cabin barges are fixtures or the equivalent thereof under Minnesota law. Because the cabin barges constitute part of the condemned realty and enhance the value of the land to which they are constructively annexed, the defendant is entitled to just compensation for their value.

■ The government argues that the mobile cabin barges cannot be fixtures because they are similar to railroad rolling stock which has been held not to be a fixture. Williamson v. New Jersey Southern R.R., 29 N.J.Eq. 311 (1878); Nelson, Benton & O'Donnell v. Iowa Eastern R.R., 51 Iowa 184, 1 N.W. 434 (1879). This analogy is not convincing. Railroad rolling stock has a substantially more extensive range of mobility, it is easily removable from condemned land, and its connection in terms of time and space with a particular parcel of condemned realty is manifestly less direct. The fact that the cabin boats do not ply waters wholly owned by the defendants is likewise not controlling.

■ The government urges that the cabin barges are not compensable because they were operated and used on border waters subject to regulation by a treaty between the United States and Canada. The fact that a treaty is involved seems irrelevant to the question of compensation. The Petes do not question the power of the federal government to condemn their land nor to take their boats. The government clearly has such power under the circumstances of this case. The Petes are concerned only with the legal consequences that attach once that power has been exercised.

■ The government also relies on Southern Counties Gas Co. v. United States, 157 F.Supp. 934, 141 Ct.Cl. 28 (1958). The court is not convinced by this case, if it can be said to be analogous. Cf. United States v. 25.4 Acres of Land, 71 F.Supp. 248 (E.D.N.Y.1947), rev'd on other grounds sub nom. United States v. Brooklyn Union Gas Co., 168 F. 2d 391 (2d Cir. 1948). The government further urges that it has the right to exclude all persons from navigable waters and that the consequent loss of use of navigable water by the Petes as riparian owners is not compensable. Clearly such is the law. United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967); United States v. Birnbach, 400 F.2d 378 (8th Cir. 1968).

What the landowners here are seeking however and which this court is allowing is the value of the tangible property taken, i. e., the boats, and not the value attributable to the Petes' present or future right to ply navigable waters. While these and other cases may affect or determine the measure or amount of compensation, they are not determinative as to the fact of compensation nor as to the question of whether there has been a taking.

■ Similarly the issue as to whether a business has been lost or taken relates at best to the amount or measure of compensation, not the fact of whether the taking of tangible property should go uncompensated. The question of the amount of compensation of course differs from the question of entitlement to compensation.

■ The principle the court is applying and the finding herein made seems to the court to be analogous to the doctrine of severance damage. It has been held over and over again that where only a portion of a tract of realty is condemned but the remaining part is rendered inaccessible or otherwise its value is destroyed or seriously impaired a landowner is entitled to a monetary award for the taking of the residue even though such is not included in the description of what is taken by the condemnor. 29A C.J.S. Eminent Domain § 139 (cases cited); 27 Am.Jur.2d § 310 (cases cited); 95 A.L.R.2d 887; United States v. Benning, 330 F.2d 527, 533–534 (9th Cir. 1964). So here, the Petes' real property is condemned according to the description of tract 3520Cc in the proceedings but the three boats are attempted to be excluded from the declaration of taking. In light of the facts of this case, it seems clear to the court that the application of the severance doctrine is apt. Accordingly, the Petes are entitled to recover compensation, whether or not technically called severance damages, to the extent of their entire property interest, including the three boats, result-

ing from the condemnation of tract 3520Cc. It should be noted that the court is not now in this opinion considering questions of valuation or proper measure of compensation, but merely the landowners' *right* to compensation.

■ The facts of this case suggest a further argument. The Fifth Amendment reads in part: "nor shall private property be taken for public use, without just compensation." In the landmark case of United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1944), the Supreme Court defined the scope and meaning of this constitutional provision. The critical terms are "property," "taken" and "just compensation." "Property" the Court said was:

"* * * the group of rights inhering in the citizens relation to the physical thing, as the right to possess, use and dispose of it * * *. The constitutional provision is addressed to every sort of interest the citizen may possess."

The Petes in the present case had various property rights inherent in their ownership of the three floating cabin barges. They had the rights, *inter alia*, to possess, use, sell, and employ the boats for commercial advantage in conformance with lawful governmental regulations. In short, the Petes by virtue of their ownership interest had "property" and rights therein protected by the Fifth Amendment.

The Court in *General Motors* in discussing the concept of "taken" stated:

"In its primary meaning, the term "taken" would seem to signify something more than destruction, for it might well be claimed that one does not take what he destroys. But the construction of the phrase has not been so narrow. The courts have held that the deprivation of the former owner rather than the accretion of a right or interest to the sovereign constitutes the taking. Governmental action short of acquisition of title or oc-

cupancy has been held, if its *effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.* [Emphasis added]

This broad language was further elaborated and delimited in United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). *Causby* involved a suit in the Court of Claims against the United States to recover for an alleged taking by the government of plaintiff's home and chicken farm which was adjacent to a municipal airport leased to the government. The taking was said to occur as a result of airplane flights so low and so frequent over plaintiff's land as to be a direct and immediate interference with the use and enjoyment of the land. As many as 150 chickens were killed when they flew into walls from fright. The value of the property was significantly depreciated. In effect, the result of the governmental activity was the destruction of the use of the property as a commercial chicken farm. The Supreme Court held that these facts were sufficient to constitute a "taking" under the Fifth Amendment. The taking was in the nature of an easement of flight, which if found to be permanent, would be the equivalent to taking the entire fee interest.

■ In *Causby*, the Court was concerned with the nature of the plaintiff's interest in the property and the extent to which governmental action interferred with that interest. Substance and not mere form was controlling. The owner's right to possess and exploit the land and other incidents of his beneficial ownership had been destroyed. It was the character of the invasion that was determinative. If the damage or interference with the use of the property is "substantial" and "direct and immediate," that determines whether there has been a taking. See also United States v. Cress, 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917).

■ Relating these principles to the facts in the present controversy, it

would appear that the total array of governmental activity in the Basswood Lake region constitutes a "taking" of defendants' cabin barges. The United States Government has condemned all land surrounding Basswood Lake and prohibited the use of gasoline powered engines on the Lake. Defendants cannot land their boats on shore for purposes of repair or storage, they cannot utilize the gasoline engines to propel the boats, and they cannot use the boats for any commercially advantageous purpose. Such a situation constitutes a substantial, direct and immediate interference with the defendants' use and enjoyment of the boats and is, therefore, a taking within the meaning of the Fifth Amendment.

In the instant case, the utility of the boats as property has been effectively destroyed. The right to drift aimlessly in a landlocked lake is the equivalent of no right at all. Removal is impossible. Governmental action which interferes so extensively with an owner's rights in his property is a "taking" within the meaning of the Fifth Amendment.

 It is of course the general rule that there is no compensation for personal property or the cost of removing personal property when land is condemned. United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1944); Sykes v. United States, 392 F.2d 735, (8 Cir. 1968). The theory underlying this principle is that property has not been "taken" because the property is readily severable and removable from the condemned land. But where governmental activity as under the facts of this case produces circumstances under which property cannot be removed without physically destroying the same or where the only reasonable alternative open to the owner

is abandonment, such activity constitutes a "taking" within the meaning of the Fifth Amendment.

Although the court believes that the Petes are entitled to just compensation for the taking of the boats under the rationale of the *Causby* and *General Motors* cases, it seems clear that this court has no subject matter jurisdiction to make a complete award of compensation on that basis. The present litigation is concerned only with that aspect of governmental activity condemning specific parcels of realty owned by the Petes.

 The claim for compensation based on *Causby* and *General Motors* is in the nature of a claim against the United States, founded on the Fifth Amendment and as such is within the subject matter jurisdiction of the Court of Claims pursuant to 28 U.S.C. § 1491 (1). Although this court as a federal district court has concurrent jurisdiction with the Court of Claims, such extends only to civil actions or claims against the United States *not exceeding $10,000*. 28 U.S.C. § 1346(a) (2) [3] This jurisdictional limitation has been rigorously applied in the federal courts. Blanchard v. St. Paul Fire & Marine Ins. Co., 341 F.2d 351, 358 (5th Cir. 1965), cert. denied, 382 U.S. 829, 86 S. Ct. 66, 15 L.Ed.2d 73 (1965); Drake v. Treadwell Construction Co., 299 F.2d 789, 791 (3d Cir. 1962); Ove Gustavsson Contracting Co., Inc. v. Floete, 278 F.2d 912, 914 (2d Cir.) cert. denied, 364 U.S. 894, 81 S.Ct. 225, 5 L.Ed.2d 188 (1960). On the basis of the landowners' claim and the jury verdict in the instant case, it is clear that the three boats, regardless of the method of valuation, involve more than $10,000. This somewhat lengthy discussion of the *Causby* and *General Motors* cases has been undertaken to attempt to provide

3. The American Law Institute in a 1968 study has recommended that the subject matter jurisdiction of federal district courts be expanded in cases where the United States is a party. Field, Juris-diction of Federal Courts, A Summary of American Law Institute Proposals, 46 F.R.D. 141, 150 (1969) (Proposed §§ 1321, 1322).

additional doctrinal perspective to a case which appears to be sui generis.

The present posture of the case is that the court at the trial concluded it should receive evidence as to the three boats in order intelligently to rule on the question as to whether they were or were not fixtures. A motion in the nature of summary judgment had been previously made by the government and denied by the court. Anticipating an appeal in either event, the court, as to the Hoist Bay tracts, #3520Cc submitted alternate forms of verdict to the jury asking them to find the fair and reasonable market value of the property without the boats and the fair and reasonable market value with the boats. The jury returned a verdict of $64,000 without the boats and $149,000 with the boats thereby attributing a value of $85,000 to the boats. The Clerk of court was unable to enter judgment on these alternative verdicts and the court instructed the clerk that subsequently it would make an order directing the entry of judgment. Before the court now then is solely the question of which verdict the clerk should use in entering judgment. The court is not now passing on the question of errors allegedly committed at the trial, valuations, the validity or weight to be given evidence which was received, the question of the reasonableness or unreasonableness of the amount of the verdicts, or any other similar questions, but merely is directing the Clerk in regard to the entry of judgment, after which both parties may present the court with such motions as they deem appropriate. A separate order is entered directing the entry of judgment as to the tract 3520Cc in the amount of $149,000.

The separate tract of land in South Farm Lake included in the government condemnation as tract #4098 lies many miles from the Hoist Bay property and consists of a peninsula and three islands with no improvements thereon. This was solely owned by Jacob Pete and the jury returned a verdict of $56,000.

Without ruling on the reasonableness, validity or legality of this award, the court is directing the clerk to enter judgment as to this tract on the jury's verdict of $56,000.